[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 539 
Although we have come to the conclusion that the conviction in this case ought to be reversed on account of the insufficiency of the evidence to establish the guilt of the plaintiff in error, yet, as a new trial will be ordered, it is necessary that we should determine the questions of law which arose upon the trial, one of which, at least, is of considerable importance. It has been strenuously argued that the offence of arson in the first degree cannot be committed if the dwelling-house burned belonged to, and was in the actual possession of, the offender: in other words, that one cannot be guilty of arson in burning his own house. This was undoubtedly the rule of the common law, for the ancient definition of the felony denominated arson was the malicious and voluntary burning of the house of another. (EastP.C., 1015.) By the statute 9 George I, ch. 22, it was enacted that if any person should set fire to any house, barn or out-house, c., every person so offending, being thereof lawfully convicted, should be adjudged guilty of felony without benefit of clergy. This act, not containing the qualification that the building should belong to a person other than the offender, gave rise to a plausible argument that the Parliament intended to leave out that part of the *Page 540 
common law definition, and thus create a new offence; but the courts held otherwise. In Spalding's case (1 Leach, 258), the prisoner was indicted for voluntarily and maliciously setting fire to his own house; and there being evidence that it was situated so near other buildings as to endanger them, and that the prisoner had insured it and his goods in it, which sufficiently showed the mischievous intention with which he did the act, he was convicted. All the judges, however, were of opinion that the indictment was bad, for that arson at common law was the burning of the house of another, and that the statute (9George I., ch. 22) did not create a new offence, but only excluded the offender from clergy more clearly. The same doctrine was reiterated in Breeme's case and in Pedley's case. (1Leach, 261, 277; East P.C., 1022 et seq., where all thecases are collected.)
The statutory enactment respecting arson, in this State, prior to the revision of 1830, followed the language of the English statute of George I, and did not in terms require that the building should be the house of another; and yet it is probable that they would have received the same construction as the act from which they were apparently transcribed, and that the willful burning of one's own house would not be a felony.
It is apparent that the provisions of the Revised Statutes on this subject were framed with a perfect acquaintance with the English decisions; and that it was intended to define the offence anew and with precision, especially upon the points which had been the subjects of controversy in the courts. Thus: "Arson in the first degree, the punishment of which is prescribed in this title, consists in willfully setting fire to, or burning, in the night-time, a dwelling-house in which there shall be at the time some human being; and every house, prison, jail, or other edifice which shall have been usually occupied by persons lodging therein at night, shall be deemed a dwelling-house of any person so lodging therein." (2 R.S., 657, § 9.) That this was intended to be a full description of the crime is apparent, not only from the formal statement that it shall consist *Page 541 
in the circumstances stated, but from the consideration that it embraces certain particulars which were not before connected with the definition of arson, namely, that it must be a nocturnal burning, and that there must be some living person in the building at the time. There is no ground for the argument applied to the act of George I, that it was only a provision respecting the punishment of an offence created by the common law, and remaining unaltered in its essential features. It is quite clear, on the contrary, that it was the creation of a new offence not known to the common law or to any former statute.
The definition of arson in the second degree, and the first specification of that crime in the third, are equally silent as to the ownership of the subject of the burning. The expression is: any dwelling-house, or any shop, warehouse, c. (Id.,
666, 667, §§ 1, 2, 3.) These provisions relate to the burning of inhabited dwelling-houses in the day-time, and of buildings adjoining to or within the curtilage of a dwelling-house, the burning of which would endanger the dwelling, in the night, and also (§ 3) in the day-time. They are aimed against acts more or less dangerous to life; and it was not regarded as material to the public whether the building burned was that of the offender or of some other person. The remaining definitions of arson relate to buildings other than dwellings, and to those unconnected with dwellings; to property insured against fire and burned to defraud the insurer, and to ships, vessels, and certain personal property; and in these cases a qualification is introduced to shield a party from punishment who burns property which is his own, and the burning of which is not calculated to injure any one else. In the fourth section it is: the house of another; in the seventh: not being the property of such person; and in the eighth: not belonging to himself. It will thus be seen, that the Legislature took up the subject of arson denovo, and, disregarding the description of the offence at common law, arranged it anew into classes or degrees, specifying by a discriminating description what should be essential to each degree. Where it was intended to make an invasion of the property of another essential to the crime, the description *Page 542 
embraced that feature; and where it was not so intended, it was left out. If other evidence were wanting, it would be found in the manner in which the provisions were reported to the Legislature, and the observations of the revisors by which they were accompanied, together with a significant change made by the Legislature when they were enacted. In the section defining arson in the first degree, the words, "burning in the night-time the dwelling-house of another," contained in the section as reported, were changed into "burning in the night-time a dwelling-house," as they now stand in the Revised Statutes. The first specification of arson in the second degree, which was enacted as reported, so far as the present question is concerned, was as follows: "Every person who shall willfully set fire to or burnany inhabited dwelling-house in the day-time which, if committed in the night-time, would be arson in the first degree, shall, upon conviction, be adjudged guilty of arson in the second degree." In the note attached to this section, the revisors remark that, as drawn, it would include the case of a man setting fire to his own house. The Legislature not only enacted it in this particular as drawn, but they changed the prior sections defining arson in the first degree to correspond with it in the respect in which we are considering it. It is, therefore, quite impossible to deny that it was the intention of the Legislature to make one guilty of arson in the first degree in burning his own dwelling-house, if done under the circumstances mentioned in the definition of that offence. The British Parliament has lately modified the law respecting arson, so as to render it immaterial whether the house burned be that of the offender himself or of a third person. (Stat. 1 Vic., ch. 89, § 3; Reg. v. Ball, 1Mood. C.C., 30.)
The position seems to me so plain, that I should not have felt it necessary to spend time in explaining it but for the circumstance that opposite opinions have been expressed. In ThePeople v. Gates (15 Wend., 159), Chief Justice SAVAGE came to the conclusion that arson in the first degree could not be committed by one burning his own house. The point, however, was not necessarily involved in the case, and what *Page 543 
was said may be considered a dictum; but in The People v.Henderson (1 Park. C.R., 560), the point was determined, at a general term of the Supreme Court, in accordance with thatdictum, upon demurrer to an indictment. It was considered by the judge who gave the opinion in that case, that the common law was to be called in, in aid of the statute. It was overlooked, I think, that it was the clear intention of the Legislature to make new definitions of this offence, in derogation of the common law rules.
The other points ruled by the Court of General Sessions do not present any difficulty. The building was properly laid as the dwelling house of Christian Geyer. He usually and habitually occupied it by lodging therein at night, and it was, therefore, constructively his dwelling-house, by the express terms of the statute. It is argued that the statute does not apply where the defendant is the general owner of the building and occupies a portion of it himself, and the dicta of judges were cited to show that in indictments for burglary where the breaking was of the apartment of a lodger, it could not be regarded as his dwelling-house, if the owner resided in the same building. (Rex
v. Rogers, 1 Leach, 104; Same v. Carroll, id., 272.) But burglary consists in breaking and entering the dwelling-house of another, which arson, in this degree, as we have seen, does not; so that the connection of the offender with the ownership of the building, which is very material in the cases cited, is not at all important here. Besides, the statute declares that a building shall be deemed the dwelling-house of any person usually lodging therein, thus necessarily implying that if there were several persons so lodging in the house the indictment may name any one of them. If it may lay the house as the dwelling of any one of several lodgers, where the offender is not one of them, it would be equally correct to do so where he is himself the owner and a lodger; for his ownership and possession is a circumstance not material in determining whether the offence has been committed. I conceive that the indictment might have charged this house as the dwelling of the prisoner, or, if there had been other *Page 544 
lodgers, that any one of them might have been named, and consequently that it was quite correct to insert the name of Geyer. Either method would have sufficiently identified the building, which is all that the ends of justice require. The statute intended to give a rule of ready application and thus to relieve prosecuting officers from observing the nice distinctions made in some of the cases.
The evidence tending to show that the house was insured for more than its value, and that the defendant called for the insurance money was competent. Upon the theory of the prosecution, he, in burning the house, committed two offences, namely, the one upon which the indictment was found, and arson in the third degree, under section 5, in burning a house insured against fire with intent to prejudice the insurer. No evidence, which was only material to prove the last mentioned charge, was competent on this trial; but it was not an objection to the evidence that, besides being pertinent to the charge for which the defendant was on trial, it tended also to establish an inferior grade of crime for which he had not been indicted. We may consider the case, then, as though the section last mentioned was not in the statute. The prisoner's house had been burned and he was charged, upon circumstantial evidence, with having set it on fire. Prima facie he had no motive for the act, but a strong pecuniary one against it. But if he had a contract of indemnity, and especially if under it he might probably obtain more than the value of the property, the case would be quite different. On a question of competency, we are not to presume that more weight would be given to the evidence than it deserved to have; but it could not be excluded, as long as we admit evidence of motive to be given in cases depending upon circumstantial evidence. Among the most common evidence in such cases, is that which goes to show the motives of the accused. It does not of itself prove anything, but it tends to remove the improbability of his having done an act which he must have known to be wrong, and which, in this case, would, without the evidence in question, *Page 545 
have appeared to be prejudicial to his interests. (Best onPresumptions of Law and Fact, §§ 231, 232.)
The evidence showing the terms upon which the prisoner lived with his wife was of the same general character. Ordinarily one would be slow to do an act which would endanger the safety of a person connected with him in this relation. But if, instead of the sentiments of regard and affection, he entertained towards her feelings of bitterness and hatred, the presumption would be quite otherwise. The evidence offered was competent. It is another question whether that actually given ought to have had any influence upon the question of the prisoner's guilt. I think, therefore, that no rule of law was violated in the rulings of the recorder on the trial.
But we are required by statute in this class of cases, where the trial was before the Court of Sessions of the city of New York, to order a new trial if we are satisfied that the verdict against the prisoner was against the weight of evidence. (Laws
1855, ch. 337, § 3; Laws 1858, ch. 330.)
The only material fact proved by direct evidence was that the dwelling-house mentioned was burned in the night-time. This did not necessarily show that a crime had been committed by any one. Accidental fires are not so unusual that the mere fact of a light wooden building taking fire would lead to the inference of crime. No act of the prisoner is proved connecting him with the burning. His criminal agency is sought to be inferred from certain circumstances which it is said afford an irresistible presumption against him. In such cases the circumstances themselves must be satisfactorily established, and they must be of such a character as, if true, to exclude, to a moral certainty, every other hypothesis but that of the guilt of the accused. (Best onPresumptions, § 210.) In both these requisites the case against the prisoner was defective. The circumstances relied on are the following: 1. That the property was insured for more than its value; 2. That the prisoner entertained such vindictive and revengeful feelings against his wife as to raise a strong presumption that he would burn his house in order to destroy *Page 546 
her, or, that having murdered her he burned the house in order to conceal the evidence of his guilt; or, at least that he would not be deterred from burning up the house by a regard for her safety; 3. That he gave contradictory accounts of the part of the house where the fire commenced and the manner in which he effected his escape; and, 4, that prior to the burning he removed and concealed personal property, and afterwards claimed its value of the insurance company.
In regard to the alleged over-insurance, the evidence was very contradictory. That the house was one of the poorest and cheapest, cannot be doubted. It was insured for only $250. The evidence as to value which seems to me the most satisfactory was that of Mr. Taylor, the master-builder, who, though he had not seen the house, had been furnished with a plan and specifications, the accuracy of which was not disputed. His opinion was that its cost was $448, assuming it to have been built of the cheapest materials and in the most inexpensive manner; and it was not old. He produced a detailed statement of the various items, footing at the sum mentioned. The policy was effected nearly two years before the trial; and about one year before he had procured a renewal. There was no evidence of any representation by the prisoner upon which the policy was issued, or in what manner the value was arrived at. He called for the insurance money very promptly, but this did not tend to prove an over-valuation or a desire to defraud the company. Upon this part of the case my opinion is, that the evidence was not sufficient to be submitted to the jury, if the defendant had been indicted for a burning with intent to defraud the insurers, and scarcely enough if the question had arisen in an action on the policy. There was no evidence of animosity or vindictiveness on the part of the accused towards his wife, or even of settled dislike, nor any from which such feelings could be inferred. There had been quarrels, and he had probably misused her at times; but the instances of this were remote from the period of the fire. Probably as much could be shown, as was proved in this case, in regard to a great many families in their condition in life, *Page 547 
where the husband was intemperate and passionate; but it would be most unreasonable to infer from it a disregard of the safety or life of the wife. If there had been evidence of the fact of the arson, this testimony would have some tendency to rebut the inference in his favor growing out of the fact that the life of his wife was involved in the calamity. As independent evidence to prove that he set fire to his house it was entitled to no consideration.
The prisoner had declared that the fire had commenced on the lower floor, and he so swore in his statement to the insurance company. Geyer, who lodged in that part of the house, kept no fire: and there was, besides, evidence by some witnesses that it first appeared in the roof, and by others that it was first seen in the apartment occupied by the prisoner. Suppose it to be established that it began in the part occupied by the prisoner, it would show that he might have kindled it, not that he did do so; and his denial that it originated there, and his assertion that it commenced in Geyer's part, would not bear strongly against him, unless it appeared that there was no chance for mistake on his part. But, assuming that he was innocent, he was suddenly waked from his sleep and found the house on fire, so that he had great difficulty in escaping with his life. It is clear that he might easily have been mistaken as to the part of the house in which the fire originated; and if he was unconscious of having caused it by anything which he had done in his own apartment, he would naturally suppose that it commenced in some other part of the building.
The alleged discrepancy in his account of the manner in which he escaped from the house, and the reason why his wife was left behind, is not striking, and in my opinion no important inference can be derived from it.
If it had been satisfactorily shown that after the fire he was in possession of property of value which had usually been kept in the house, and which he had represented to have been burned and the value of which he had claimed of the insurance company, and he had not explained the circumstance, I should not be in favor of interfering with the verdict. The *Page 548 
attempt to establish such a state of facts failed from the want of identification of the property. There was a fact sworn to, which, if it could have been followed out, would have seriously implicated the prisoner. His wife had owned a watch, and after the fire he had declared that it was lost with the other property; but he did not claim it in his proof of loss, and it does not seem to be embraced in his description of personal property insured. McGuire, a watchmaker, swore that the prisoner left a watch at his shop in July after the fire. The witness said: "Shepard gave the name of Robinson when he left the watch." There was no proof that this watch was the one which had been owned by the prisoner's wife. If this had been shown, and if McGuire is to be understood as swearing that the defendant represented his own name to be Robinson, the testimony would have had a grave bearing upon the case. Without this proof of identity, it can have no legal influence, except that the concealment by the prisoner of his name is calculated to give rise to vague suspicions that there may be more in the case than was shown.
I attribute very little weight to the intemperate expressions said to have been used by the prisoner respecting his wife and the destruction of his property. The jury had no doubt a right to consider and construe them; but it would be rash to regard them as admissions of a design to murder his wife and commit arson by burning up his house. They were made in the presence of his wife and of her friends, and do not seem to have been considered as serious in their character.
The prisoner was entitled to the benefit of the fact that his person was scorched by the fire, and to the apparent improbability, arising from that circumstance, that it was kindled by his agency.
Upon the whole, the impressions made upon my mind by a careful reading of the testimony is that it is very doubtful how the fire originated. If it were a historical, instead of a judicial inquiry, I should be unable to say that there was even a strong probability that it was set by the prisoner. It may *Page 549 
have been, and there are some grounds of suspicion, but nothing, I think, to warrant a capital conviction.
The judgment of the Supreme Court and that of the General Sessions must be reversed, and a new trial be ordered.
All the judges concurred, except that STRONG, J., was of opinion that arson in the first degree could not be committed by burning one's own dwelling-house.
Judgment reversed and new trial ordered.