THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
*v.* LLOYD LEWIS, Appellant.

Argued June 9, 1937; decided July 13, 1937.

*Frederick S. Holbrook* for appellant. The evidence does not support motive on the part of the defendant. (*People* v. *Myer,* 164 App. Div. 296; *People* v. *Fitzgerald,* 156 N. Y. 253; *People* v. *Wagner,* 71 App. Div. 399; *Shepherd* v. *People,* 19 N. Y. 537.)

*Nathan D. Lapham, District Attorney,* for respondent. The evidence satisfies the tests applicable to circumstantial evidence as a proof of guilt. (*People* v. *Giordano,* 213 N. Y. 575; *People* v. *Harris,* 136 N. Y. 423; *People* v. *Smith,* 245 App. Div. 69; *People* v. *Kennedy,* 32 N. Y. 141; *People* v. *Razezicz,* 206 N. Y. 249; *People* v. *Galbo,* 218 N. Y. 283; *People* v. *Place,* 157 N. Y. 584; *People* v. *Badger,* 217 App. Div. 424.)

RIPPEY, J. Under the provisions of section 222, subdivision 5, of the Penal Law, defendant was indicted for and convicted of the commission of the crime of arson in the second degree. The charge was that on November 30, 1931, in the town of Victor, Ontario county, New York, he willfully set on fire and burned a barn which at the time contained farm implements, including a vehicle for the transportation of manure, such building and the personal property contained therein being insured against loss or damage by fire. Supplementing the statement in the indictment, a bill of particulars stated that the barn burned was a building on a farm owned and operated by defendant and that the act was committed wrongfully, unlawfully and feloniously and with intent to prejudice and/or defraud the insurer.

The defendant and his wife and two small children resided on a farm consisting of about 123 acres which he had purchased for a home in 1927. One of the buildings

consisted of a barn 132 feet, 5 inches long north and south and 30 feet, 3 inches wide, located approximately 125 feet from the highway leading into Victor. On the southeast corner of the barn and below the level of the entrance to the first floor was located a milkhouse, in which there was a gasoline engine used in connection with the milk cooling apparatus and to run the milking machine. A door led out of the milkhouse to an alleyway or runway extending along the south end of the barn from which, some distance from the milkhouse, a door opened into a cow stable in the basement of the barn. From some point in the cow stable a stairway led to the main floor of the barn, on which was standing a load of hay too wet to be put in the mow. To the side and above, extending upwards to the top of the barn, the bays were filled with hay. In the gable at the south end of the barn was a door through which hay was carried by a hayfork and trolley from the outside into the bay, and, at the time of the fire, hay was hanging out of the door at a height of about eight feet above the roof of the milkhouse. The exhaust pipe from the gasoline engine in the milkhouse extended out through the roof under and near the opening through which hay was carried into the barn. Across the south end of the barn were two silos filled with silage. Prior to the time of the fire, defendant had collected together his farm tools and machinery at odd times when it was too wet to work the land and had placed them in the basement of the barn for storage for the winter. At the time of the fire the barn contained seven loads of oats, four tons of bean pods, ground oats, dairy feed and rye, and the bays and lofts were filled with hay. The defendant had twenty head of cattle and six horses, all outside the barn at the time of the fire; only a small calf was in the barn.

At and immediately preceding the time of the fire, on November 30, 1931, two of defendant's hired men were engaged in loading manure on a wagon on the west side of the barn. They had been working all of that day

drawing manure out to the field. Defendant's wife and two children were in the residence. In the afternoon, defendant left his home by automobile and drove to Victor, where at about two P. M. he purchased, at a store where he had been accustomed to buy supplies for the house, a quantity of groceries and four gallons of kerosene which was contained in a square can. He had purchased kerosene from the same store from time to time over a period of at least a year previously and he used it both for his stove and for lamps in his residence. He returned to his home about three P. M. and stopped near the garage. There is some conflict in the testimony as to exactly what occurred immediately afterwards. One of the hired men testified that he saw him take something from his automobile which looked like a can and place it in the milkhouse, after which he took the groceries into the house. His wife testified that as soon as he stopped the automobile he first took the groceries into the house, then she and he went to the garage and he procured a small can and siphoned some gasoline from the tank of the automobile and took the can to the milkhouse for the purpose of starting the gasoline engine. There is no definite testimony anywhere in the case that the can containing kerosene was taken into the milkhouse. After arriving at the milkhouse, defendant succeeded in starting the gasoline engine, although he had difficulty in starting it. He left the milkhouse, went around to the west side of the barn where the men were working, picked up a fork and started to help the men load the wagon with manure. During this period the men heard the gasoline engine running. After they had been working awhile, one of the men testified he heard a crackling noise, looked up and saw that the building was on fire. He called to the other men to drive the horses out and he started to a nearby residence to telephone for help. Defendant went to the house, procured two pails from his wife, went to a pump nearby and filled the pails and came back to the house. By that time help had arrived and one of the

neighbors attached ropes to the handles of the pails and defendant went up onto the roof of his residence and drew up the water. He remained there to protect the house from fire and others helped to remove household furniture. There was no evidence that the defendant was in any of the buildings immediately preceding the fire except in the milkhouse and in the residence. A few days after the fire, the insurance adjusters asked defendant how the fire started. He told them that at about three o'clock in the afternoon he started the gasoline engine which was used in connection with the operation of a milking machine, that he was in the engine room for some little time, that the engine did not start readily, but after he had started it he went to the west side of the barn and remained there helping the men load manure until the fire was discovered and that he was not sure that the fire started in the engine room or from the gasoline engine or from the operation of it and that after the fire started he could not get into the engine room because it was afire.

The People established that the wind was from the southwest and that flames were first seen coming from the roof of the barn on the west side, on the southwest corner, or on the south side, as variously testified to, and evidence was also introduced to indicate that the milkhouse was not consumed until the upper portion of the barn was completely burned.

Thus the evidence of incendiarism was solely circumstantial. The People were required to rely upon the evidence (1) that defendant purchased a can of kerosene, (2) that he was seen going to the milkhouse with what looked like a can, (3) that thereafter flames were seen coming from the west or south end of the barn and that the wind was blowing from the southwest. From the facts above recited it was the theory of the People that the defendant entered the milkhouse with the kerosene, left it by way of the door opening into the alleyway, pro-

ceeded along the alleyway to the cow stable, through the cow stable up to the main floor, and set the barn on fire at a point from which the wind would be expected to carry the flames so that the entire barn might be consumed. This was pure conjecture. Such a conclusion could rest only in surmise and be based upon inference on inference. There was not a scintilla of direct evidence that he did any such thing. So far as incendiarism in and of itself is concerned, the only material fact established by direct evidence was that the barn burned. The conceded fact was that defendant brought home from the grocery store a can of kerosene. There was no definite direct evidence as to what he did with this can of kerosene after he reached home. The only evidence on that subject is that given by the hired man to the effect that he saw him get out of the automobile, take something from it which looked like a can, and go with what he had to the milkhouse. The jury were required to infer from that testimony that what looked like a can was the can of kerosene and was taken to the milkhouse. They were then asked to draw the further inference that the defendant proceeded by the course above indicated into the barn and used the kerosene for the purpose of starting a fire, and this in the face of the fact that it all occurred in the daytime with hired men working in the immediate vicinity, with the barn filled with hay which could have been ignited with a match without the necessity of kerosene with equal certainty of it burning quickly. No inference such as the People sought could reasonably be drawn from the established facts. Nor could any inference be properly drawn of incendiarism from defendant's conduct after the fire was discovered. With fire burning in a barn filled with hay and bound to consume the barn, no matter what efforts might have been made to stop it, the only rational course for defendant to pursue was to protect his residence, if possible, from the fire. Nor was there any evidence that the defendant definitely stated

that the fire started in the milkhouse. All he said was that he did not know where it started and inferred that the only way that he could account for it was the possibility it came from sparks from the gasoline engine through the exhaust igniting the hay hanging out of the door at the south end of the barn. He made no assertion that that was the way the fire started, except in the proof of loss he said that its cause " was evidently from a gasoline engine used to operate a milking machine," nor did he assert that he knew how it started, but he orally asserted the contrary at the time the above statement was made to the adjusters. Nor was his conduct consistent with guilt. If defendant planned, on the theory advanced by the People, to set fire to the barn, he presented the opportunity for the procurement of evidence from the grocer from whom the purchase of kerosene was made and from witnesses who were present when he took the kerosene to the barn of every circumstance on which the inference that he used that method of firing the barn was based. No reason is assigned why he may have been willing to be apprehended, convicted and incarcerated for arson, or even hinted at. That he would pursue such a course of conduct is not probable. The inference of guilt would not naturally flow from the facts and circumstances thus proved or be consistent with them. It is a rule too well settled to require extensive citation of authority that where circumstantial evidence is relied upon, the facts upon which inferences must be drawn must themselves be satisfactorily established and must be of such a character as, if true, to exclude to a moral certainty every other hypothesis but that of the guilt of the accused, and that the ultimate fact may not be based on inference upon inference. (*Shepherd* v. *People,* 19 N. Y. 537, 545; *People* v. *Fitzgerald,* 156 N. Y. 253.)

At most, the foregoing evidence was of such a doubtful probative value that it was essential for the People to

establish motive, and this they attempted to do by showing the defendant stood to gain by collection of insurance on the barn. Additionally, such a showing was necessary to establish one of the essential elements of the crime charged. These conclusions were sought solely upon the basis of circumstantial evidence. " Motive," says the court in the *Fitzgerald Case* (*supra*, at p. 258), " is an inducement, or that which leads or tempts the mind to indulge the criminal act. It is resorted to as a means of arriving at an ultimate fact, not for the purpose of explaining the reason of a criminal act which has been clearly proved, but for the important aid it may render in completing the proof of the commission of the act when it might otherwise remain in doubt. With motives, in any speculative sense, neither the law nor the tribunal which administers it has any concern. It is in cases of proof by circumstantial evidence that the motive often becomes not only material but controlling, and in such cases the facts from which it may be inferred must be proved. It cannot be imagined any more than any other circumstance in the case."

*Prima facie*, defendant had no motive for the commission of the crime, but, rather, a strong motive to the contrary. The greater portion of the trial was devoted to the efforts to establish facts from which the inference might be drawn that it was to defendant's pecuniary interest to fire the barn, but the record as a whole establishes no facts from which any such inference could reasonably be drawn. It was shown that he carried a policy of insurance for $3,000 on the barn, with a farm produce, auto and livestock clause attached, with the Ontario County Patrons Fire Relief Association. A few days after the fire, adjusters representing the insurance carrier with long experience in adjusting fire losses called upon defendant and he presented them with a list of the tools and equipment and the contents of the barn that were burned. Some sinister inference is sought to be

drawn from the fact that defendant made up a list of his alleged losses and that, when inquiry was made by the adjusters as to what he thought they were worth, he gave his figures. Nevertheless, the adjusters testified that they based the loss upon sound value as they themselves determined it to be and did not permit defendant to fix the valuation. No suggestion has been made that the $3,000 loss adjustment on the barn was excessive. No evidence of value of separate articles of farm machinery was introduced, with a few exceptions, and defendant's counsel has computed the difference between the adjustment of $1,800 made on farm machinery and valuation testified to at ninety-five dollars. The District Attorney replies by stating " that upon the trial we made no contention that the small difference in values of the items selected represented the amount and extent of the deception." The evidence tended to establish that some tools were old and worn and in disrepair, but such proof without tangible evidence of overvaluation is insufficient to establish that defendant secured an adjustment of his loss at an amount alleged to be far in excess of the actual value of the property burned. The tools were burned. The adjusters were satisfied to accept defendant's list. There is no evidence in the record of deceit. The evidence indicated that the fire insurance was taken out at the time when the barn was purchased and was neither increased nor decreased from that time, notwithstanding that the defendant had during that period and running down to shortly before the fire made extensive improvements; he had built two silos; he had concreted the entire south end of the barn; he had installed a concrete watering trough in the horse stable; he had painted the milkhouse, and he had installed new stanchions for the cattle. These improvements had been made at times when he could spare the time from his necessary farm work. The evidence also established that he had made improvements to the house in which they lived. He had

stocked up the barn with food for the maintenance of his dairy herd during the winter, and without this barn he had no other place to accommodate them. There was no evidence that he was, at the time, financially embarrassed. The only reasonable inference from the evidence was that he had built up a home to keep, not to destroy. The evidence as a whole establishes a strong lack of motive and its absence is a powerful circumstance in the exculpation of the defendant where reliance is placed entirely upon circumstantial evidence to establish the crime. (*Shepherd* v. *People, supra.*)

The facts and circumstances established in this case are not only not consistent with the guilt of the defendant but are consistent with his innocence. They may furnish some grounds of suspicion; they furnish nothing else. As a matter of law there was no evidence to submit to the jury from which it might draw the inference of guilt beyond reasonable doubt.

Questions were raised upon exceptions to the admission or exclusion of evidence or to the charge which could not be overlooked except for the conclusion which we have reached. Our decision makes consideration of those questions unnecessary.

The judgments should be reversed, the indictment dismissed and the defendant discharged.

CRANE, Ch. J., HUBBS, LOUGHRAN and FINCH, JJ., concur; LEHMAN and O'BRIEN, JJ., taking no part.

Judgments reversed, etc.