THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* ABE
LASHKOWITZ, Appellant.

Third Department, July 11, 1939.

*Isadore Rothenberg* [*Ellis J. Staley* of counsel], for the appellant.

*William Deckelman, District Attorney,* for the respondent.

HEFFERNAN, J.   Defendant is appealing from a judgment of the
Columbia Trial Term of the Supreme Court rendered on October 31,
1938, convicting him of the crime of arson in the second degree
under which judgment he was sentenced to imprisonment in Clinton
Prison at Dannemora under an indeterminate sentence of from
eight to sixteen years.

At a Trial Term of the Supreme Court held in Sullivan county,
the grand jury on October 12, 1937, returned an indictment against
this defendant, Philip Goldberg, Benjamin Weiner and Abe Wailes,
charging them with the crimes of arson in the second and third
degrees.   The indictment against defendant was transferred to
the County Court of Sullivan county and on his application he was
granted a separate trial.   That trial resulted in a disagreement of
the jury.   Defendant then moved for a change of venue.   That
application was granted and the case was ordered tried in the
Supreme Court of Columbia county.

The indictment is in the short form and was amplified by two bills of particulars. We are concerned only with the first count of the indictment charging the defendant with the crime of arson in the second degree. The bill of particulars relating to that count charges the defendants with burning a building known as the Old Mill property located in Woodridge in the town of Falls-burgh, county of Sullivan, " with intent to prejudice or defraud the insurer thereof," in violation of subdivision 5 of section 222 of the Penal Law.

The charge upon which defendant has been convicted is not that he actually took part in the destruction of the building. The contention of the People is that defendant employed the codefend-ants to burn this building for a money consideration and that consequently he is a principal within the meaning of section 2 of the Penal Law. The building in question was destroyed by fire during the early hours of the morning of October 13, 1932. Although defendant was charged with and convicted of a crime which occurred on the 13th day of October, 1932, no indictment was found against him until October 12, 1937, that being the last day when criminal proceedings could be instituted against him. (Code Crim. Proc. § 142.)

Because of the nature of some of the evidence it is necessary to describe the property involved with some detail. This property is located on the easterly side of the Mountaindale road in the village of Woodridge. It adjoins the railway property of the New York, Ontario and Western Railway, where the highway crosses the railroad tracks. Upon this property there was located a building known as the Old Smith Mill. Originally it had been used for the storing and sale of feed, coal and grain. At the time of the fire, however, and for some time prior thereto, this building was used as a store property, bus station and coal yard. The building as it then stood consisted of two sections. The front part of the main building was twenty-five feet by eighty-six feet, three stories high. This part was divided into two stores with front door entrances. They had no rear or side entrance. The store next to the railroad property was occupied as a grocery store, conducted by a Mrs. Reiter. It had no kitchen in the rear. The store next to the grocery store was used as a lunchroom. It also had no kitchen. Added to the front part of the building and on the side of the lunchroom was a small one-story building fourteen feet front and twenty-eight feet deep. This store had a front and side door entrance. It was used as a candy store and bus station. The rear of the main building and an extension thereof was twenty-five feet wide and one hundred feet deep, two stories high. It

had coal pockets on top in one section. It had two doors on the side adjoining the railroad and one large and one small door on the opposite side.

Defendant's original connection with this property was as mortgagee. A man named Smith had a first mortgage on the property on which there was unpaid $8,000. Defendant owned a second mortgage in the sum of $5,000 and the First National Bank of Woodridge was the owner of a third mortgage amounting to $3,000. The Smith mortgage was foreclosed and by an arrangement between himself and the bank defendant purchased the property at the foreclosure sale on August 2, 1929. Defendant then had an investment in the property of $19,144.38 which included the amounts of the three mortgages, taxes and foreclosure expenses. On August 27, 1929, defendant conveyed a portion of the property to the bank for $5,500 and he sold the remainder to the Woodridge Milling Co., Inc., for $13,644.38. He received from the corporation $2,000 in cash and two purchase-money mortgages, one for $9,000 and the other for $2,644.38. Woodridge Milling Co., Inc., defaulted on its mortgage and defendant was obliged to foreclose the same. He also became the purchaser of the property at the foreclosure sale and received the referee's deed on June 23, 1930. As a result of these transactions defendant became the owner of the property with the buildings thereon which we have already described except that portion which was used as a bus station.

On September 9, 1930, defendant contracted to sell the property to Lincoln Coach Corporation for $12,500 and at that time received a down payment of $500. Apparently Lincoln Coach Corporation was unable to carry out its contract. On August 10, 1931, after obtaining a release from Lincoln Coach Corporation, defendant sold the property to Orseck Boys, Inc., for $12,450. That concern made a down payment of $500, gave a note for $450 which was later paid and delivered to the defendant its bond and mortgage for the balance of $11,500. Under the terms of the mortgage $500 of the principal was payable on June 1, 1932, and a like sum on July 15, 1932. These payments were made. The balance was payable as follows: July 15, 1933, $1,000; July 15, 1934, $1,000; July 15, 1935, $1,000, and the remainder of $7,500 July 15. 1936. The mortgage carried interest at the rate of six per cent per annum.

After the Orseck Boys, Inc., acquired title to the property it insured the buildings against loss by fire in the sum of $10,000. These policies were delivered to defendant and contained the usual mortgagee clause making the loss payable to defendant as mortgagee. The policies were five in number and ran for one year from September 15, 1931. At the expiration date new policies with the same

provisions were issued for another year in the same amount and these policies likewise were delivered to defendant. Before the issuance of the first policies an agent for the insurance companies appraised the value of the buildings at $15,000.

Upon the trial of the action real estate experts called by the People testified that the property in 1930 was worth $24,000 and that at the time of the fire it was worth between $10,000 and $15,000; that the reproduction cost of the buildings was approximately $24,000. The buildings were completely destroyed by the fire. At the time of the destruction of these buildings there was due on defendant's mortgage the sum of $10,500 of principal besides some interest.

Upon the trial the defendants Abe Wailes and Philip Goldberg were the principal witnesses produced by the prosecution. The codefendant Weiner was not sworn as a witness. Wailes and Goldberg testified in substance that on the night of the fire they entered the rear of the building with Weiner, sprayed gasoline or other inflammable substance, inside of the rear part of the building, then placed part of the same substance in a butter tub in the kitchen in the rear of the grocery store, attached a fuse which Goldberg lit and left the building. Goldberg testified that he watched the flames consume the building. In view of the fact that Wailes and Goldberg are the principal witnesses for the People it is well to glance at their records and to examine their testimony somewhat in detail. Each contradicted the other in many important particulars and in many instances their testimony is at variance with the physical facts. Both were promised and received immunity for their participation in this crime as a reward for their testimony against defendant. Both are desperate and depraved characters. Both would be unlikely to hesitate at the commission of any crime. Wailes has spent twenty-four and one-half years in prison and at the time of this trial was serving an unfinished term. Goldberg served a prison sentence for arson.

Wailes testified that in the early part of September, 1932, he was approached by Weiner relative to the commission of this crime. Later he accompanied Weiner and one Hoffman, Weiner's nephew who acted as his chauffeur, to Woodridge. There they met defendant who stated that he was willing to spend $500 to set the building on fire. Wailes declined because the price was not sufficient for that kind of a risk. Later he was again approached by Weiner and again came to Woodridge in company with Goldberg, Weiner and Hoffman, and that on this occasion defendant said it would not be convenient to fire the buildings at that time because it was just before a Jewish holiday. Five days later he again came to Wood-

ridge with Goldberg, Weiner and Hoffman and there they met defendant at the mill property and some discussion was had about the failure of defendant to cut a hole in the bins. On October 11, 1932, he again came to Woodridge with Goldberg, Weiner and Hoffman and he talked to defendant at Blinder's Hotel. He said that he stayed at the hotel until the morning of October 13, 1932, following the fire and then left for New Jersey; that in the early evening of October twelfth he accompanied Mr. Blinder and his wife to the synagogue where there was a celebration; that late that night, with Goldberg and Weiner, he went to the building and took part in its burning. He further testified that while at Blinder's he was served with meals in the kitchen of the small house by Mrs. Blinder and slept in a bedroom in the same house; that Jack Blinder, a son of the proprietor of the hotel, served them in the kitchen and was in the hotel in the early evening; that when he returned from the synagogue on the evening of October twelfth, Pearl Blinder and Hoffman were playing cards. He further testified that while at the mill building on October twelfth he, Goldberg and Weiner were in the kitchen of the grocery store; that gasoline from five gallon tanks was spread around and that Goldberg placed the fuse and lit it with a lighted cigar. Wailes further testified that on the evening of October thirteenth he, Goldberg and Weiner were driven to Suffern by Hoffman and there he met defendant about eight or nine o'clock; that defendant gave Weiner in payment for the job two cases of liquor; that the liquor was taken from defendant's car by Hoffman and placed in the Weiner car; that an arrangement was then made for all to meet the following morning at the home of defendant's brother in New York city when further payment would be made. He testified that on the morning of October fourteenth, about ten o'clock, they met defendant at his brother's house in New York; that an argument ensued about the price for the job and that while waiting for defendant to appear they were served some refreshments by defendant's sister in law; that defendant came in and took out a roll of bills around $300 and offered it in payment and then left.

Goldberg testified that he had a talk with Weiner in the first week of September, 1932, and that about a week later he went to Woodridge with Weiner and a man named Jarose, sometimes referred to as Moose. He testified that they slept at Blinder's; that he did not see defendant and that they returned to New Jersey; that in the latter part of September he, Weiner and Jarose again went to Woodridge and stayed at Blinder's; that they bought five gallon tanks of gasoline at a Monroe street gas station and put them in a trap of the machine. He said that Weiner and Jarose left Blinder's

to put the gasoline away; that Weiner said they had put it in some barn or stable back of a big building and covered it up; that he and Weiner left Blinder's and went to the building and had a discussion about cutting a hole in a portion of the building. They then returned to Blinder's and stayed overnight. He also said that in the beginning of October he, Weiner, Hoffman and Wailes again went to Woodridge and stayed at Blinder's. He also testified that on October 11, 1932, he, Weiner, Hoffman and Wailes again went to Woodridge; that they stopped at Blinder's and that he went to the building that night with Weiner and Wailes; that he went up and spread gasoline on the inside and top of the building; that they went to a single door of the grocery store which Weiner opened and that Weiner filled two butter tubs with gasoline, covered them with paper and that he, Goldberg, put the fuse in place and lit it with a cigarette. Goldberg testified that they then returned to Blinder's and that when about 100 feet from Blinder's the building was blown up; that he went back and looked around and then returned to Blinder's, stayed overnight and left for New Jersey the following morning. He also testified that he went to Suffern that night with Weiner, Wailes and Hoffman and met defendant who brought four cases of Overholt and who gave Weiner $200 and said that he would pay the balance the following morning at his brother's home in New York city; that on the following morning he, Weiner, Wailes and Hoffman went to the brother's house where there was an argument between Weiner and defendant about the money; that Weiner got mad, took out a bunch of money and put it on the table and that he, Goldberg, took it, put it in his pocket and went away. Goldberg also testified that while at Blinder's on October eleventh and twelfth they all ate in the dining room; that Blinder's son was there; that after the fire he went back to Blinder's but did not see anybody. Goldberg also testified that on the former trial he said that on the trips to Woodridge when Jarose was with him they talked about the fire and about getting some money out of it; that Jarose put the gasoline in the automobile before it was brought up; that when at Suffern, Hoffman and Wailes put the liquor in the trap of the Weiner car; that there was a fight there between Wailes and Hoffman and that Wailes broke Hoffman's nose because he took too much time. He also testified that when in New York city on October fourteenth, defendant's sister in law brought out some cake and that her husband served some wine. He said that it was Weiner who put $200 on the table and that defendant did not take any money out and put it on the table and also that he and Wailes left together. Goldberg also testified on the former trial that he was an experienced firebug, that his experience proved itself and that it was a good fire.

If Wailes and Goldberg are telling the truth it is singular that there is not a bit of evidence in the record which corroborates them as to their testimony regarding the fire, their presence at Suffern the following morning or their meeting in New York city on October fourteenth. Even Hoffman, who it is claimed was present at Suffern and assisted in putting the cases of liquor in the trap of the automobile and whose nose it is claimed was broken at that time, and who was a witness for the People in this case, does not testify to any such presence or occurrence. He testified he had no particular recollection of any trip to Suffern and says that he slept in the hotel in Woodridge one night.

Both Wailes and Goldberg testified that on the night of the fire they entered the kitchen of the grocery store through a side door where the gasoline was placed in a butter tub and where the fire was lit. The credible evidence shows that the grocery store had no kitchen and no side entrance and that the only entrance to the grocery store and also to the lunchroom, were the front entrances. Wailes testified that on the evening of October twelfth he went with Blinder and his wife to the Woodridge Synagogue and attended a celebration there. The fact that there was no meeting or celebration there on that night is established by the evidence of the secretary of the Ladies' Society of the Woodridge Synagogue, by the sexton and by the president of the synagogue.

Jack Blinder, a police officer of the village of Woodridge, testified that he attended the firemen's parade at Jeffersonville with his wife and mother on October 12, 1932, leaving the hotel at eleven o'clock in the morning and returning between six and seven o'clock in the evening; that neither Wailes, Goldberg nor any strangers were at the hotel on October eleventh or twelfth; that Weiner was not there.

On the evening of October thirteenth when the People's witnesses claim that the defendant was at Suffern, N. Y., the evidence of the defendant to the effect that he was not at Suffern but at Woodridge on that evening is sustained by the evidence of several credible witnesses who had business transactions with the defendant on that evening.

The People's testimony that defendant met Weiner, Wailes and Goldberg at his brother's home in New York city on October fourteenth is disputed by defendant's witnesses.

The most important witness for defendant, Benjamin Terwilliger, testified that he was the cashier of the First National Bank of Woodridge. He produced from the records of the bank a deposit slip in the handwriting of defendant showing a deposit made on October 14, 1932. He said this deposit was made before twelve

o'clock in the morning. Defendant testified that he personally made the deposit in the bank around ten or eleven o'clock in the morning.

Many other witnesses testified that they had seen defendant in Woodridge on the morning of October fourteenth at the time when the People's witnesses claim he was in New York city.

It is impossible to comment on all this evidence without undue prolixity. Suffice it to say that we are convinced that the jury's verdict is against the weight of the credible evidence.

Defendant could not be convicted upon the testimony of the accomplices Goldberg, Weiner and Wailes unless they were corroborated " by such other evidence as tends to connect the defendant with the commission of the crime." (Code Crim. Proc. § 399.) For the purpose of furnishing corroboration the People called two witnesses, Jarose, heretofore referred to, and one Chirichello. If the evidence given by these two witnesses does not supply the necessary corroboration then corroboration is wholly lacking because no other witness attempted to give testimony on that branch of the case.

It is interesting to note that Jarose is also an ex-convict. The testimony which he gave and which the prosecution relies upon for corroboration is in relation to a key of the building. The claim of the prosecution is that defendant gave Weiner a key to the building and that Weiner actually used this key in trying to open the door. Jarose testified that in company with Weiner he went to defendant's place of business in the month of September, 1932. He said that Weiner and defendant had a conversation in Jewish which he could not understand. He said he saw defendant give Weiner a key which the latter put in his pocket. The witness said that the key looked like a regular house key. He was asked if he could identify the key as the one which defendant gave to Weiner and he answered: " *Why, Weiner told me it was the key.*" He was then asked when Weiner made that statement and he answered: " When we were going back to Passaic   *   *   *   the next morning." The delivery of a key by defendant to Weiner furnishes no corroboration tending to connect the defendant with the crime unless there was evidence that this was done in aid of the commission of a crime and that key was used for that purpose. In fact there is no competent evidence in the record that the key used by Weiner at the mill building was the key which he received from defendant. The identity of the key handed to Weiner and the key used by the latter in trying to open the door of the mill building is not made by Jarose on his knowledge of the fact but upon what Weiner told him on the way to Passaic. Of course Weiner's testimony as to

this key is no corroboration of the testimony of Wailes and Goldberg and certainly such corroboration is not supplied by having Jarose testify to what Weiner told him. The effect of Jarose's testimony so far as it tends to connect the defendant with the crime and to corroborate the testimony of Wailes and Goldberg is to furnish such corroboration by testifying to a declaration of an accomplice made at a time wholly unrelated to any act of the crime. Declarations of a conspirator or accomplice which are in the nature of narratives are not admissible. (*People* v. *Quinn,* 123 App. Div. 682.) Evidence to be corroboration of an accomplice must tend to connect the defendant with the crime and not with the accomplice. (*People* v. *Josephs,* 143 App. Div. 534.)

It is clear, therefore, that the testimony of Jarose does not furnish corroboration and is purely hearsay.

Chirichello was employed by Weiner as a chauffeur. He testified that he and Weiner stopped at defendant's house in June, 1937, at which time Weiner and defendant had a conversation. He was asked to state the conversation and he made answer: " He [Weiner] said, ' Abe I need $200 and I have got to have it,' he said, ' on the old mill job that I burned down for you in Woodridge.' " The record discloses that this was the third time that Chirichello testified to this conversation. The first time was before the grand jury on June 29, 1937, a few days after it was claimed to have taken place. At that time, as he later admitted, he did not mention $200. Before the grand jury he testified that the statement which Weiner made to defendant was " the exact words, Ben Weiner said it was about time that he gave him some money on the old job," to which defendant answered, " Lashkowitz told him [Weiner] he made enough money on him during the alcohol period, and Ben Weiner was bringing it up to Lashkowitz."

On the first trial in County Court Chirichello in describing what occurred on the occasion said that Weiner told defendant, " He was broke and needed money," and that defendant replied that Weiner " made enough money during the alcohol period and he wouldn't give him any money."

For the first time on this trial Chirichello testified that Weiner made a request for a definite sum and the words, " on the old mill job that I burned down for you in Woodridge," are added.

In our opinion this does not provide sufficient corroboration. At best it is only an incompetent declaration by an accomplice. The testimony furnishes no corroboration by the answer of defendant. The only possible theory upon which that evidence could be competent would be on the theory of an admission by defendant. It is to be noted that defendant's answer is not responsive to an

accusation of crime but is solely limited to a response to a request for money. To that portion of the question which carried the implication of crime no response was made by defendant. The silence of defendant in answer to Weiner's accusation cannot be construed as an admission of guilt. (*People* v. *Butler*, 62 App. Div. 508; *People* v. *Bissert*, 71 id. 118; *People* v. *Countryman*, 201 id. 805; *People* v. *Koerner*, 154 N. Y. 355; *People* v. *Page*, 162 id. 272; *People* v. *Kennedy*, 164 id. 449.) These authorities expressly hold that defendant's silence as to Weiner's accusation is without any probative force to establish his guilt.

In discussing the same subject Chief Judge POUND, speaking for the Court of Appeals in *People* v. *Rutigliano* (261 N. Y. 103), said: " These cases and others hold that proof of such declarations made in the presence of the accused, even when competent, is dangerous evidence which should always be received with caution and only under such circumstances as would justify an inference of assent from the fact that the accused remained silent." Having concluded that the silence of defendant was not an admission then this testimony is valueless for there is no probative value in Weiner's statement taken by itself. This statement was made almost five years after the commission of the crime. It is well settled that the declarations of a conspirator are not evidence of the acts of a conspiracy after the object of the conspiracy has been accomplished and are not admissible as against a coconspirator or a codefendant. (*People* v. *Davis*, 56 N. Y. 95; *People* v. *Stetz*, 206 App. Div. 223; *Brown* v. *United States*, 150 U. S. 93.)

The testimony of Chirichello like the testimony of Jarose is merely an unsworn declaration by an accomplice related by a third party. It is not only hearsay but has no more corroborative value than the statement the accomplice himself would have made if he took the stand. The introduction of Jarose and Chirichello to recount the story of the accomplice Weiner gives no probative value to a case based entirely on the story of co-conspirators.

Apparently the trial judge left to the jury the guilt or innocence of defendant entirely dependent upon their conclusion that Jarose and Chirichello were telling the truth. In his charge the trial judge made this statement:

" In this case the testimony urged by the People as corroborative of the accomplices is that of Jarose and Chirichello.   *   *   *

" The sufficiency of the corroboration will be the next question you will have to determine. You will have to weigh the testimony of such witnesses; Chirichello, and if you so decide, Jarose, and determine whether they are telling the truth. You will apply to them the tests of the credibility of witnesses which I have outlined

to you and such others as appeal to your ordinary common sense and good judgment. If, after careful deliberation, you determine that such witnesses are not worthy of your belief, then, of course, you will discard their testimony. There being no corroboration, you will have to render a verdict of not guilty. If, on the other hand, you reach the conclusion that such witnesses are telling the truth and provide sufficient corroboration, you may find a verdict of guilty if, in your opinion, all the evidence in the case points to guilty beyond a reasonable doubt."

Clearly the quoted portion of the charge is erroneous and is subject to the same criticism which we made of the trial judge's charge in *People* v. *Viscio* (241 App. Div. 499). We there said that the charge should be full, clear and explicit. In the charge under consideration but one page is devoted to a reference to the testimony which is vital to the guilt or innocence of defendant. No statement is made by the court as to what testimony of these witnesses, if believed by the jury, as a matter of law, constitutes corroboration, or upon what basis its corroborating effect should be accepted or rejected by the jury. We all know that the court's charge is of supreme importance to the accused. It should be the safeguard of fairness and impartiality and the guarantee of judicial indifference to individuals. What the court failed to do and what it should have done in the interests of justice to all parties was to indicate clearly to the jury what testimony of Jarose and Chirichello should be given any corroborating effect and the manner of the application of the law to such testimony. The jury was left by the charge to determine its verdict upon its conclusion as to whether Jarose and Chirichello were telling the truth.

The district attorney urges that defendant failed to request the trial judge to charge further on the subject and failed to take exception. The absence of such a request or the failure to except is not fatal. (*People* v. *Viscio, supra;* Code Crim. Proc. § 527.)

There is but one other question which we need discuss. Defendant was convicted of burning the building with intent to prejudice or defraud the insurer thereof. The intent to defraud is a necessary element of the crime. (*People* v. *Lewis*, 275 N. Y. 33.) The evidence fails to establish such intention. Certainly the defendant had no motive to commit this crime. He owned mortgages on other property in that vicinity amounting to $72,000. He was not in need of money. He had adequate assets to carry on the business he was conducting. Concededly the property destroyed was worth considerably more than his mortgage. Concededly the mortgagor was a solvent corporation and answerable on its bond. There is no proof in this record on which the jury might find an intent on the part of defendant to defraud the insurance company.

Proof of defendant's good character was furnished by his neighbors who had known him many years. Like proof was made as to his good financial standing in the community.

It is earnestly insisted by the district attorney that defendant is guilty. That assertion has not the slightest influence with us; much less does it serve to persuade us to approve a verdict tainted with legal error. The duty is cast upon us to see that defendant is given a fair trial in accordance with the law of the land.

The judgment of conviction should be reversed on the law and facts and a new trial granted.

HILL, P. J., and CRAPSER, J., concur; BLISS, J., dissents.

Judgment of conviction reversed on the law and facts, and a new trial granted.