THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* BERNARD C. MURRAY, Alias Henry E. MANNING, Appellant.

Third Department, May 1, 1940.

*Alec Rosefsky* and *Samuel W. Bernstein*, for the appellant.

*Daniel J. McAvoy, District Attorney*, for the respondent.

HILL, P. J.   Defendant appeals from a judgment convicting him of arson in the first degree as a second offense.   He was sentenced to imprisonment in Attica State Prison for a minimum of forty and a maximum of fifty years.   Proof was given that he had been convicted in the Superior Court of Dedham, Mass., April 20, 1927, for assault with intent to commit rape.   No other previous conviction was proven, though he was indicted as a third offender.

The fire occurred in the city of Binghamton at about eight o'clock in the evening of April 9, 1938, in the Moon Block on the

westerly side of Chenango street (No. 133) a short distance southerly from .Lewis street which extends in a westerly direction from Chenango. The wife of the janitor who lived on the fourth floor noticed a little smoke coming up the front stairway. She descended by the rear stairs into the basement and called her husband. He came up the front stairs and discovered the fire in the interior of a wardrobe that stood on the landing between the first and second flights. By the time he had procured water from the fourth floor, it had spread into the hall. The wardrobe, approximately four and one-half by one and one-half and seven feet high, belonged to a railroad engineer who lived on the second floor and used it to store his overalls worn upon the engine, rubber boots, a jug of vinegar, an electric fan, garden hose, hand saw and an empty cardboard carton. The proofs upon which the jury was permitted to find that the fire was of an incendiary origin were statements by the janitor, a fire chief and some other persons, that the odor of kerosene was discernible in the vicinity, and the evidence of a chemist who analyzed the contents of a can of charred wood and rags collected from the debris. He stated: " The charred wood and charred rags in it yielded one-tenth of a gram of light petroleum oil having the sensible properties of kerosene. * * * It might have been the heavy part of gasoline or a lot of other light petroleum products that are used for fuels." Defendant at the time of the trial was forty-eight years of age, born in Holyoke, Mass. Upon examination before sentence (Code Civ. Proc. § 485-a) it appeared that his education ceased with third-year high school, that he was married, a steamfitter by trade, and had been convicted of the assault earlier mentioned, and of grand larceny, second degree, in 1932 in Broome county and sentenced to Auburn State Prison for five years. For a time after regaining his liberty he had boarded with a Mrs. Hotchkiss on the third floor of No. 133 Chenango street. She had moved before the fire, and he for about a month had been an inmate of the Broome County Almshouse near Binghamton.

The evidence that the fire was of incendiary origin was weak, but probably sufficient to present a question of fact for the jury. The charge on this issue left much to be desired. The evidence by which the People sought to show defendant's guilt was given by Joseph Varsik, a plainclothes patrolman of the city detective bureau, and Floyd L. Allen, a New York State Trooper. The former testified that he saw defendant enter the hallway of No. 133 from the street, and the latter that he saw him emerge. This established nothing beyond an opportunity for the defendant to have gone up the stairs and kindled the fire in the wardrobe. It is further

argued that defendant's denial that he entered the hallway sustains an inference of guilt because he made an untrue statement as to his whereabouts. There was no other evidence or inference connecting defendant with the fire. The patrolman and the trooper had shadowed the defendant closely for about two hours before this fire occurred. This apparently was customary with these officers whenever the defendant came to Binghamton. Varsik says that he had seen defendant three times prior to the fire, in August, 1937, March 26 and April 2, 1938; that he had followed him a few hours on the first occasion, and seven or eight hours on each of the two subsequent occasions. Allen first saw defendant at the county farm on March twenty-first, and apparently accompanied Varsik for two and a half hours on March twenty-sixth and for the entire seven or eight hours on April second. The reason for this scrutiny is not disclosed. On the evening in question these officers first saw defendant at about six-fifteen in a restaurant where he was drinking beer with a county employee. When he left this restaurant, they shadowed him to another located in the same block at No. 133 Chenango street, and from thence several blocks to the sidewalk in front of the Capital Theatre, where he stayed for a considerable period of time, then back to Chenango street, and, after a brief divergence, northerly along that street and into an alley which led to an areaway in the rear of the block of which No. 133 is a part, and from which two alleys lead to Lewis street, from one of which he emerged and proceeded a short distance westerly, returning to the areaway through the second alley. There is some discrepancy between the officers in the timing of these movements, and a little difficulty in making them fit into the interval before the fire started. There was no doubt that defendant knew he was being followed, as the conduct of the officers was so obvious that one of the People's witnesses stated in reference to them: " I looked out a window and seen two men on the sidewalk by the Kilmer building. They were acting very strange. Q. Did you notice them signaling? A. Yes I did."

Under our view of the law of this case it is of little importance, but the testimony of Varsik that he saw defendant enter the No. 133 hallway is not convincing. Lewis street does not cross Chenango, but runs westerly therefrom. Allen did not see defendant enter the hallway. Varsik's testimony in connection therewith follows: " Trooper Allen was about 20 feet east of me on Lewis St. and about that time Murray came back out this alley here. * * * started north on Chenango St. as far as the Victoria restaurant and when he passed the entrance to the Victoria restaurant, he turned in the hallway north of the Victoria restaurant. Q. Was that the

hallway leading to 133? A. That's right." The alley here mentioned is the one leading from Chenango street by which the defendant first passed to the rear of the Moon Block. The hallway was not visible from Lewis street at any place westerly from its intersection with Chenango. Had Allen been east of Varsik, who was standing on the corner, he would have been in the roadway of Chenango street, with No. 133 quite as visible to him as to Varsik. The evidence of Allen as to this particular happening, if not contradictory to that given by Varsik, at least is not corroborative.

" Q. Excuse me just a minute. Let me ask you this, when you got up to Officer Varsik after he signalled to you, did you at that time see the defendant Murray on Lewis St.? A. No, I didn't. Q. After you had this conference with Officer Varsik, what did you do? Did you at that time come down Chenango St.? A. I came over here. Q. You looked for him up on Lewis? A. Yes, sir, I did. Q. Of course, at that time did you have information that the defendant was in one of these alleys off of Lewis St.? A. Officer Varsik told me so. Q. Then what next happened? A. After I was over here, Officer Varsik called me over here and stated to me that he saw him go into an alley. Q. Where did Officer Varsik go? A. Officer Varsik told me he came up out of the alley that he went into. Q. Then where did Officer Varsik go? A. Officer Varsik went to the rear of the alley down at the back of the Moon Block. Q. Then where did you go? A. I came down Chenango St. Q. As you came down Chenango St., will you please tell the Court and these gentlemen what happened, what you saw? A. As I was coming down the street, I got in front of the Variety Food Store, in front of the window there and Mr. Murray came out of this hallway walking fast and came down Chenango St. and into the Hollywood Restaurant. Q. When you say he came out of this hallway, please tell the jury what street number that hallway is. A. 133 Chenango."

The People have failed to show any motive on behalf of the defendant or that he had access to kerosene, gasoline or any petroleum product with which it was suggested that the fire was kindled. Giving full credence to the unsatisfactory testimony of Varsik that defendant went upon the ground floor of the building, there is nothing to show that he ascended to the second floor where the fire occurred. Defendant had been under the close scrutiny of the officers and it was not shown that he carried a container for volatiles. The result of a chemical analysis of his clothing was negative.

The trial court in its charge stated: " In considering this case, you have a right to take into consideration the movements of this

defendant during the evening of April 9, 1938, both prior to and after the fire and also his denials of his whereabouts on that occasion, his concealing his movements, for such denials and such concealment may be considered by you as evidence of a guilty knowledge or a guilty conscience or guilty acts." This, and other somewhat similar statements in the charge may explain the verdict. These statements assumed the truth of the testimony given by the officers. This was a question of fact to be determined by the jury and not by the court. No inference of guilt could be drawn from the officers' account of defendant's movements before it is asserted that he entered No. 133. What might seem unusual conduct was as consonant with an attempt to evade the surveillance of these "strange acting" men who had been following him for weeks, as with an intent to commit arson. It was for the jury, and not for the court, to determine whether defendant did enter the hallway of No. 133, and whether his denial thereof was true or false. If true, it had little weight and could be considered by the jury only after a correct charge, which was not given. Concerning evidence somewhat comparable with this, the opinion in *People* v. *Rainier* (127 App. Div. 47, 48) is germane: " In spite of the fact that the night watchman swore with great positiveness that he saw the defendant and his companion emerge from the entrance to the apartment house, the identification was by no means satisfactory, for it was quite as possible that the defendant and his companion were emerging from the apartment house after having been lawfully there, as that they were the individuals that had been running on the tops of the adjoining houses. It will be seen that the defect in the People's case was that there was no proof that the defendant and his companion were not in the apartment house on lawful business." SHAW, Ch. J., in *Commonwealth* v. *Webster* (5 Cush. 295, 316), wrote: " To the same head may be referred all attempts on the part of the accused to suppress evidence, to suggest false and deceptive explanations * * * all or any of which tend somewhat to prove consciousness of guilt, and, when proved, to exert an influence against the accused. But this consideration is not to be pressed too urgently; because an innocent man, when placed by circumstances in a condition of suspicion and danger, may resort to deception in the hope of avoiding the force of such proofs." In *People* v. *Nowakowski* (221 App. Div. 521) the judgment of conviction was reversed, the opinion stating concerning a false statement made by the defendant as to his presence near the scene of the crime (p. 523): " The weight and persuasive value of this inference varies in accordance with the amount and weight of the other evidence in the case tending to show guilt, for it operates

ordinarily only by way of lending strength to other and more tangible evidence." *People* v. *Dragone* (223 App. Div. 529) cites with approval and quotes the above excerpt from the *Nowakowski* case. The genesis of this rule is discussed by Wigmore (1 Wigmore on Evidence [1st ed.], § 278) who cites cases beginning with the year 1743.

Proof that defendant had an opportunity to commit the crime is not sufficient. The People's case fails to come up to the standard necessary to establish guilt by circumstantial evidence. The acts proven do not lead irresistibly to the guilt of the defendant, nor exclude to a moral certainty every other hypothesis. They are not inconsistent with his innocence. Under such circumstances, a conviction on circumstantial evidence may not be sustained. (*People* v. *Lewis*, 275 N. Y. 33; *People* v. *Galbo*, 218 id. 283; *People* v. *Razezicz*, 206 id. 249; *People* v. *Sowma*, 252 App. Div. 413; *People* v. *Nowakowski, supra; People* v. *Dragone, supra.*) " ' Insufficient evidence is, in the eye of the law, no evidence.' " (*Matter of Case*, 214 N. Y., 199, 203; *People* v. *Galbo, supra,* 292.) Under the latter rule there is no evidence to connect the defendant with the commission of the crime, and the indictment should be dismissed. Suspicion might have been aroused by defendant's peregrinations on the evening of the fire, but that is not sufficient. These might well have been occasioned by the unexplained surveillance of the officers on this and previous evenings. This defendant's earlier convictions might justify officers in exercising a reasonable scrutiny of his conduct, but he is not a pariah and should not be harassed without reason.

The judgment of conviction should be reversed on the law, and the indictment dismissed.

CRAPSER, HEFFERNAN, SCHENCK and FOSTER, JJ., concur.

Judgment of conviction reversed on the law and facts, and indictment dismissed.