# Court of Appeals.

June 1898.

## PEOPLE v. JOHN M. FITZGERALD.

1. CRIMINAL LAW—PRINCIPAL.

In the criminal law, a person concerned in the commission of a crime, whether he directly commits the act constituting the offense or aids or abets in its commission, and whether present or absent, or, directly or indirectly, counsels, commands, induces or procures another to commit the crime, is a principal.

2. EVIDENCE—CIRCUMSTANTIAL.

When a criminal charge is sought to be sustained wholly by circumstantial evidence, the hypothesis of guilty or delinquency should flow naturally from the facts and circumstances proved and be consistent with them all.

3. SAME.

The facts and circumstances must all be consistent with and point to the guilt of the accused not only, but they must be inconsistent with his innocence.

**4. SAME—MOTIVE.**

In case of proof by circumstantial evidence, the motive often becomes not only material but controlling; in such case, the facts from which it may be inferred must be proved.

**5. SAME.**

The motive, attributed to the accused in any case, must have some legal or logical relation to the criminal act, according to known rules and principles of human conduct. If it has not such relation, or if it points in one direction as well as in the other, it cannot be considered a legitimate part of the proof.

**6. SAME—SIMILAR ACTS.**

If evidence tends to prove a motive for the commission of the offense charged, it is none the less admissible because it tends also to prove that the defendant may have been guilty of some other crime or moral delinquency.

**7. SAME.**

Past transactions, involving suspicion of other possible wrongdoing, or acts from which inferences of moral turpitude may be drawn, should be excluded, unless they have some bearing on the main fact to be proved.

**8. SAME—CHARACTER.**

Moral character of defendant is not involved in the inquiry, where he does not make it a subject for debate himself, or testify in his own behalf.

**9. EVIDENCE—IRRELEVANT.**

A circumstance which has no bearing on the case one way or the other, and will present the defendant to the jury in a very unfavorable light with respect to a transaction foreign to the issue, should be excluded.

**10. SAME.**

Letter, witten by bishop of diocese to defendant prior to commission of alleged crime, which has not tendency to throw light on the real question of fact involved in the case, and can only prejudice and mislead the jury, is inadmissible.

**11. DEFENDANT AS WITNESS—PRESUMPTION.**

The fact that the accused does not testify in his own behalf cannot be permitted to create any presumption against him. The force of this proposition should not be weakened or destroyed with the jury by qualifying words.

**12. EVIDENCE—CROSS-EXAMINATION.**

Question on cross-examination, which relates to the very transaction that the witness had described on his direct examination, and has a plain tendency to explain or modify it, is proper, and ruling excluding it is error.

APPEAL from a judgment of the appellate division of the supreme court in the fourth judicial department, affirming a judgment of the Monroe County court entered upon a verdict convicting the defendant of the crime of arson in the second degree, and an order denying a motion for a new trial.

David N. Salisbury, for appellant.

George D. Forsyth, for respondent.

O'BRIEN, J.—The defendant was indicted for the crime of arson in the first degree, convicted of arson in the second degree, and sentenced to imprisonment in the state prison for a term of ten years. The specific charge in the indictment was that on the 17th day of July, 1895, he set fire in the night and burned the parochial schoolhouse in the village of Charlotte, in which building there was at the time a human being. The building was the property of a religious corporation, and the defendant, as the pastor of the parish church, with which the school was connected, was one of the five trustees who had charge of the corporate property and the management of the temporal affairs of the congregation. In this capacity, as trustee, he had procured the building to be insured to an amount fully equal to, if not in excess of, the actual value, the loss, if any, being payable by the terms of the policies to the corporation by its corporate name.

It is not claimed that the defendant actually or personally set the fire. Indeed, it is admitted on all sides that on the night when the fire took place he was absent from the scene of the crime, and could not have personally participated in it. The theory of the prosecution is that the fire was set by one John Cronin, and it incidentally appears in the record that he was convicted of the crime, but that the defendant procured him to do the criminal act. Cronin was the servant of the religious corporation, employed by the defendant in his capacity as trustee, to have the care of the church, schoolhouse, parochial residence, in which the defendant resided, and other corporate property as janitor. Practically, the relations between the defendant and Cronin where those of master and servant, since the latter was, in the discharge of his duties, subject to the

directions of the former, and to a very great extent, if not wholly, under his control.

It appears that Nora Cronin, a sister of John, was a domestic in the defendant's house, and the claim is that the defendant, through her, procured John to burn the schoolhouse. In the criminal law a person concerned in the commission of a crime, whether he directly commits the act constituting the offense or aids or abets in its commission, and whether present or absent, and a person who, directly or indirectly, counsels, commands, induces or procures another to commit a crime, is a principal. (Penal Code, § 29.) The issue presented for trial was, therefore, very clear and distinct. It was whether the defendant, in fact, did, either directly or indirectly, counsel, command, induce or procure John Cronin to commit the offense charged in the indictment. It is not claimed that there was any direct proof that he did. It was competent for the People, however, to prove the charge by circumstantial evidence, and they attempted to sustain the case wholly by evidence of that character.

The People had the burden of proof and a great variety of facts and circumstances where shown, all tending, as is claimed, to prove the main fact which was in issue. If the case was otherwise free from error, and the sole question was whether there was sufficient proof to warrant the submission of the case to the jury, we would, I think, feel concluded by the verdict with respect to the question of fact involved. But it is not every fact or circumstance from which an ingenious or imaginative mind may infer by some process of reasoning the existence of the main fact in issue that the law admits as possessing the force and certainty of evidence. In attempting to prove a fact by circumstantial evidence there are certain rules to be observed that reason and experience have found essential to the discovery of truth and the protection of innocence. The circumstances themselves must be established by direct proof and not left to rest upon inferences. The inference which is to be based upon the facts and circumstances so proved must be a clear and strong logical inference, an open and visible connection between the facts found and the proposition to be proved. When a criminal

charge is sought to be sustained wholly by circumstantial evidence the hypothesis of guilt or delinquency should flow naturally from the facts and circumstances proved and be consistent with them all. The evidence of facts and circumstances must be such as to exclude, to a moral certainty, every hypothesis but that of guilt of the offense imputed, or, in other words, the facts and circumstances must all be consistent with and point to the guilt of the accused not only, but they must be inconsistent with his innocence. In the investigation of all charges of crime it is competent to prove a motive on the part of the accused for the commission of the criminal act. Motive is an inducement, or that which leads or tempts the mind to indulge the criminal act. It is resorted to as a means of arriving at an ultimate fact, not for the purpose of explaining the reason of a criminal act which has been clearly proved, but for the important aid it may render in completing the proof of the commission of the act when it might otherwise remain in doubt. With motives, in any speculative sense, neither the law nor the tribunal which administers it has any concern. It is in cases of proof by circumstantial evidence that the motive often becomes not only material but controlling, and in such cases the facts from which it may be inferred must be proved. It cannot be imagined any more than any other circumstance in the case. People v. Bennett, 49 N. Y. 137; People v. Owens, 148 id. 648; 1 Greenl. Ev. § 13.

The motive attributed to the accused in any case must have some legal or logical relation to the criminal act according to known rules and principles of human conduct. If it has not such relation, or if it points in one direction as well as in the other, it cannot be considered a legitimate part of the proof.

In this case the People claim that the defendant had a motive in procuring the building to be destroyed, and that was that the church corporation owning it was indebted to him for arrears of salary and that his purpose was to get possession of the insurance in order to apply it on the salary claimed. The defendant was the treasurer of the corporation, and the motive supposed involved a wrongful appropriation of the money and the acquiescence of the other officers and trustees, either actively

or passively, in the scheme. Whether such a motive is a legitimate inference from the facts, or a remote speculation, we will not now inquire. Such a motive does not, in the ordinary course of things, inhere in the relations of debtor and creditor. The chances of the creditor being able to reach the money when payable to the debtor himself are so precarious, uncertain and remote, that, ordinarily, a motive to destroy the property insured cannot be attributed to the former. It may be that in this case the defendant's relations to the corporation to which the money was payable, and his control over its action, were such as to justify the imputation. Much evidence was given to show that the debt either existed or was claimed by the defendant, and the character of the proof on this point was such that the jury could draw inferences from it quite damaging and injurious to the defendant's general charcter and conduct in other respects. If, however, it tended to prove a motive for the commission of the offense charged it was none the less admissible because it tended also to prove that the defendant may have been guilty of some other crime or moral delinquency. The case was evidently tried upon the principles of the McKane Case (143 N. Y. 455). There can be no doubt, I think, that the courts went quite far enough in that case in sanctioning evidence tending to prove other offenses against the accused than the one charged. But, although they were quite injurious to the accused, they had some bearing on the main point in issue and this court was careful to point out the difficulty which a person charged with a specific offense has to meet upon such a trial with a multitude of inculpatory facts claimed to be relevant to the main issue. We observe now, as we did then, that "there is always danger in such cases that the specific charge will be lost sight of and disappear in the mass of collateral facts growing out of other subjects, and that the defendant may be convicted because of other wrongdoing with which he was not charged." (p. 475.) Any departure from the real issue in the case to investigate other transactions tends to divert the minds of the jury from the real question before them, and to prejudice the accused.

The defendant was required in this case to answer a specific

charge, and that was whether he had instigated or procured directly or indirectly, the building in question to be burned. He was not expected to be able to answer or to explain all the other faults and delinquencies of his life, and hence, past transactions involving the suspicion of other possible wrongdoing, or acts from which inferences of moral turpitude might be drawn, should have been excluded, unless it can be shown that they had some bearing on the main fact to be proved.  His moral character was not involved in the inquiry, since he did not make it a subject for debate himself, or testify in his own behalf. The rule that an accused party may resort to affirmative proof of good character in order to repel the presumption of guilt raised by the evidence, while the prosecution is not permitted to resort to proof of bad character in order to overcome the legal presumption of innocence, is founded upon the benign principles that underlie the criminal law, and is in harmony with that presumption against crime with which every investigation of a criminal charge must begin.  And however natural it may be for the common mind to reason that a person who has committed, or is suspected of having committed one offense is likely to commit another, and, therefore, be guilty of the one charged, yet the law refuses to recognize it as a fact or circumstance tending to establish the specific charge or to allow the accused to be prejudiced in that way with the jury.  The principles of the law of evidence that govern all criminal trials are, as Lord Erskine once observed, " founded in the charities of religion, in the philosophy of nature, in the truths of history and in the experience of common life."  (24 Howell's St. Tr. 966).

The record in this case discloses numerous decisions and rulings made at the trial with respect to the admission and exclusion of testimony, and in the charge of the court, which we think were erroneous and prejudicial to the defendant.  We will not attempt to deal with all the questions raised and discussed by his counsel, but only such as appear to us to be the most prominent.

(1) The People were permitted, against the defendant's objection and exception, to prove that more than two years prior to the burning of the schoolhouse, other property of the church

corporation covered by insurance had been burned, also some of the defendant's private property, and that as a consequence the agents of the insurance company insisted upon canceling policies upon other property which the defendant had procured to be written.    There was much evidence of that character offered and received, but the real origin of the former fires was left conjecture.    The defendant's counsel requested the court to instruct the jury that there was no evidence in the case to show that any of the previous fires were of incendiary origin, and that the jury should not consider them as evidence in the case.    To this request the learned trial judge replied : "I do not see anything wrong in that request, and I so charge the jury, omitting the latter fact.    That the jury should not consider any of these alleged fires is hardly proper.    There is a proper and lawful purpose for which the jury may consider those fires."    The defendant's counsel excepted to these remarks.    It is quite evident that the defendant's case was in a worse condition after the request than it was before, although the learned judge admitted that he could see nothing wrong in the request.    The jury were plainly told that they could consider the evidence for some purpose which was not stated.    We have already shown that this evidence which tended to create a suspicion in the minds of the jury that the defendant may have been connected with other offenses of the same character as the one charged was not admissible.    There was no legal connection shown between the former fires and that charged in the indictment.    There was no legitimate purpose for which the jury could consider the evidence, and as it was in the case, whether with or without objection, the request was proper and should have been charged.

(2) The People called two witnesses, who testified that in the month of November, some four months after the fire in question, they were attracted by noise in the defendant's house ; that they heard the sound of his voice and the screams of a woman that they supposed to be Nora Cronin, also the breaking of china and then the fall of some heavy body on the floor.    In a short time after the defendant came to the kitchen door without his hat. The testimony was received agaist the defendant's objection and exception. There was only one inference from the testimony, and

that was that the defendant was guilty, on the occasion testified to by the witnesses, of inflicting physical violence upon a woman who was a servant in his household. If that fact was a reasonable conclusion from the circumstances it is quite difficult to see what bearing it had upon the issues in the case. The learned district attorney reasons that inasmuch as this woman submitted to physical violence at the hands of the defendant, it must follow that she would be likely, through fear or some other influence, to become an instrument in the execution of his purpose to commit the offense for which he was on trial. We do not think that the inference naturally proceeds from the fact sought to be proved. Indeed a conclusion quite the contrary might be drawn with as much reason from the circumstances, since it could be said, with at least as much force, that the defendant had never trusted such a dangerous secret to one to whom he had given so much cause for resentment and who would be likely to seek for opportunities of revenge. The truth is that the circumstance had no bearing on the case one way or the other, and since it presented the defendant to the jury in a very unfavorable light with respect to a transaction foreign to the issue should have been excluded. The fact, if true, that the defendant was in the habit of inflicting castigation upon a domestic under such circumstances plainly tended to create prejudice against him with the jury.

(3) The bishop of the diocese, who was the defendant's official superior in the church, was called as a witness by the prosecution, and produced a letter which he had written to the defendant under date of July 11, 1895, which the district attorney gave in evidence under objection and exception of defendant's counsel. The body of the letter is in the following words: " Of late so many complaints have come to me of your repeated and public drunkenness that I cannot close my eyes any longer to your conduct. I now give you warning that if you do not quit the use of intoxicating drinks altogether and reform your life I shall be obliged to send you to a house of correction and remove you from the charge of souls. Your usefulness in your present mission is at an end, and the sooner you seek some other field of work the better it will be for yourself and for re-

ligion." It cannnot be doubted that this letter, coming from such a source, must have had great weight and influence with the jury. It was the opinion of the bishop deliberately formed with respect to the defendant's life and general conduct. It was clearly prejudicial to the defendant and should have been ex- cluded unless it proved some fact material to the issue before the jury. The learned district attorney defends the decision under which it was put into the case on the ground that since it brought home to the defendant knowledge of his relations to the bishop and the church and pointed to his removal from the charge of the parish, it was admissible on the question of motive. The motive attributed to the defendant was, as we have seen, the desire to possess himself of the money represented by the policies of insurance. One of these policies, for $1,500, was issued more than two years before the fire. Three more were issued for $4,900, in the aggregate, on July 10, 1895, seven days before the fire. The defendant, when he· procured these last policies, must have conceived the design to destroy the building, if at all, hence a letter subsequently written by the bishop and received by the defendant could not have influenced his design either in the conception or execution. It is not conceivable that he supposed the threat of sending him to a house of cor- rection could be executed against his will; and if the threat of removal had any influence at all upon his mind, he could scarcely expect that it would be delayed so long as to enable him to procure the money. The policies would not fall due until sixty days after proofs of loss, and there might be further delay and litigation before payment. The local agents of the companies were not his friends. The bishop himself was one of the trustees of the corporation with power to interfere at any time to prevent the diversion of the money to the defendant by notice to the companies, as in fact he did after the fire. The theory that this letter furnished the motive for the commission of the crime charged in purely speculative. The reasoning from cause to effect is strained, if not entirely fallacious, and it cannot be accepted in law as a justfication for the admission of evidence of such a damaging character to the defendant when it was foreign to the issue. It had no tendency to throw light on

the real question of fact involved in the case, and could only prejudice and mislead the jury.

(4) The theory of the prosecution that the defendant had a motive to procure the building to be destroyed in order to reach the money, dominates the whole case, and he had the right to have the jury properly instructed upon that branch of the case. The defendant's counsel requested the court to charge the jury that the presumption of law is that the defendant would not steal or misappropriate any money of his church society, had it got into his hands. In response to such request the court said :

"There is no such irrebuttable presumption of law that I know of. The law, on the contrary, supposes that men will sometimes misappropriate, and for that reason statutes are enacted for the punishment of grand larceny. I do not think it can be said that there is a presumption of law that men will not do wrong ; there is a presumption of law that men are innocent until their guilt is established." To the refusal to charge as requested, and to the charge as made there was an exception. We think the exception presents a material legal error. The learned judge was not requested to charge that the presumption referred to, or any other presumption in the case, was of such a character as to be conclusive. The request expressed a correct legal principle, applicable to the case, and the charge as made could scarcely fail to impress the jury with the idea that it was their duty to assume, in their deliberations, the existence of a principle just the contrary.

(5) It appeared, incidentally, in the case that the defendant appeared before the grand jury as a witness. That body was engaged in the investigation of the charge against the Cronins and John Doe. The court was requested by the defendant's counsel to instruct the jury that his failure to testify at the trial in his own behalf did not create a presumption against him, and the court thereupon proceeded to charge as follows : "I have been requested to charge you, gentlemen, that the fact that the defendant went voluntarily before the grand jury and told his story, but has not taken the witness stand here, should not raise any presumption against him. That is true, gentlemen. The defendant had a right to go before the grand jury and make his

statement there, and he had a right to change his mind and not take the stand here in this action, and the law says that no presumption shall attach to his failure to take the stand on his trial. That statute does not say, however, that the jury shall consider all of the evidence as denied by him, which he might deny if he took the stand. It does not incorporate in the evidence a denial which is not there. It simply says that the jury shall consider the evidence as it is, not strengthened or weakened by the fact that the defendant does not take the stand ; it does not say that the evidence shall be the same as if it contained a denial by him ; it does not say that the jury shall presume that the defendant would deny all the incriminating facts if he took the stand ; it says that the jury are not to presume that he would deny or admit any of the evidence, but that the jury must consider the evidence as it stands, unaffected by the fact that the defendant does not take the stand." To this portion of the charge the defendant duly excepted. In the trial of a criminal case it can never be necessary to add anything to the plain and simple language of the statute on this subject. The fact that the accused does not testify in his own behalf cannot be permitted to create any presumption against him. That is the plain mandate of the law, and the force of the proposition should not be weakened and destroyed with the jury by qualifying words. The learned judge, in contrasting the case as it was with the case as it would have been if the defendant had taken the stand, must have left the impression on the minds of the jury that, after all, something was to be taken against the defendant by reason of his omission to testify, and, therefore, this part of the charge was open to objection.

(6) The school that was conducted in the building in question was under the charge of the sisters of charity, and three or four of these ladies were called as witnesses for the People. While they all testified with a prudent caution and in guarded language, it is plain that their relations with the defendant were strained. Their testimony, much of which was received under objection and exception, presented the defendant to the jury as a clergyman, supposed to be engaged with them in a common work, but who was rude in his behavior, arbitrary and unreason-

able in the exercise of power, regardless of their just rights and feelings and of the success of the work in which they were engaged. All this may be true, but it had no bearing on the real issue in the case, and since it tended to excite prejudice against the defendant should, we think, have been excluded. The learned district attorney defends the ruling under which this class of testimony was admitted on the same ground as the letter of the bishop already referred to. The testimony is of the same general character, and points in the same direction. In one case the opinion of the bishop with reference to the defendant's life and general conduct was placed before the jury. In the other the opinions of the sisters of charity. These opin- ions, whether right or wrong, were not evidence against the de- fendant. It was, of course, competent for the People to prove by these witnesses any material fact, and so far as the testimony related to the use and character of the building, the time when the school closed and the person who had general charge at night, it was admissible. But the specific acts and interviews of the parties, reflecting upon the defendant's general conduct, were irrelevant. It would have been quite as competent for the People to call witnesses to prove the defendant's general bad character. That was virtually what was accomplished by the proof of many of the collateral facts and specific acts and transac- tions in which the case abounds. If they had any legal relation to the criminal act charged it would then be the defendant's mis- fortune, due entirely to his own disregard of the moral code. But since they had no legitimate bearing on the fact in issue, within the rules of law to which we have referred, the People had no right to prove indirectly what they could not have been permitted to show by direct proof, and that was the plain tend- ency of the evidence.

(7) The People called as a witness one of the members of a law firm with whom the defendant left the insurance policies for collection after the fire, and proved that fact and the various steps taken to collect the loss. The testimony tended to sus- tain the theory of the prosecution that the purpose of the de- fendant was to possess himself of the insurance money. On cross-examination the defendant's counsel asked the witness if

it was not the fact that the defendant, when he left the policies in his hands for collection, requested that the money which should be collected on them should be paid over to the bishop. The question was objected to by the People and excluded under exception. The question related to the very transaction that the witness had described, and had a plain tendency to explain or modify it. The defendant had a right to repel the inference which the jury were asked to draw from the fact that he had delivered the policies to the firm for collection and, hence, the question was proper and the ruling excluding it error.

There are other questions in the case which, if they stood alone, could not well be overlooked; but since they may not arise on another trial, it is unnecessary to prolong the discussion.

The judgment should be reversed and the case remanded for a new trial.

All concur.

Judgment reversed, etc.

## NOTE ON EVIDENCE OF OTHER CRIMES.

Proof may not be given of the guilt of the defendant of other crimes for the purpose of raising the presumption that he committed the crime for which he is being tried. People v. McLaughlin, 70 S. R. 496; 11 N. Y. Cr. 97.

Where evidence offered tends to prove the commission of the crime charged in the indictment, it is not incompetent because it also tends to prove the commission by defendent of another crime. State v. Modigan (Minn.), 59 N. W. 490.

Competent evidence should not be excluded merely because it tends to show that defendant was guilty of a crime other than that for which he is on trial. Moore v. United States, 14 S. Ct. 26; 150 U. S. 57.

Evidence, on cross-examination of defendant, to show that he had left another state five years before because he had committed rape there and was afraid to remain, is incompetent on trial for murder. Holder v. State, 25 S. W. 279; 58 Ark. 473.

Record on another trial of defendant for a similar offense, not connected with the one in question, is not admissible in evidence on a trial for obstructing a public road. Chaffin v. State (Tex. Cr. App.), 24 S. W. 411.