THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* DOMINICK TADDIO, Appellant.

Argued March 2, 1944; decided May 25, 1944.

*Peter F. Gulotta* for appellant. The People failed to prove its case beyond a reasonable doubt.

*Farrell M. Kane, District Attorney (Joseph A. McKinney* of counsel), for respondent. I. The defendant committed the crime. II. The facts, circumstances and the inferences which naturally flow therefrom, prove defendant guilty beyond a reasonable doubt. (*People* v. *Weiss,* 290 N. Y. 160; *Greenfield* v. *People of the State of N. Y.,* 85 N. Y. 75; *People* v. *Willett,* 213 N. Y. 368; *The People* v. *Conroy,* 97 N. Y. 62; *People* v. *Place,* 157 N. Y. 584.)

LEWIS, J. The dead body of Mary Rycoitch was found at nine o'clock on the morning of December 29, 1942, lying in a field west of an unpaved lane which leads southerly from Bloomfield Avenue in the Borough of Richmond, New York City. The decedent had suffered three wounds. On the right side of the skull was a fracture so extensive as to cause a large blood clot within the brain cavity; on the left side of the neck were two deep lacerations. Two days later the defendant was arrested and now stands convicted of murder in the first degree under an indictment which charged that on or about December 28, 1942, " in a lane off Bloomfield Avenue " he " wilfully, feloniously and of malice .aforethought, struck and killed one Mary Rycoitch with a certain instrument, the nature of which * * * is unknown * * *.' "

Concededly the defendant's conviction rests upon circumstantial evidence — a process of decision by which a court or jury may reason from circumstances which are known or proved, to establish by inference the reality of the principal fact. If in a criminal case circumstantial evidence is to be given legal effect the facts from which the inference of guilt is drawn must themselves be proved, not assumed; the controlling inference must be clear and strong, pointing logically to defendant's guilt and excluding to a moral certainty every other reasonable hypothesis. (*The People* v. *Kennedy,* 32 N. Y. 141, 145, 146; *People* v. *Harris,* 136 N. Y. 423, 429; *People* v. *Fitzgerald,* 156 N. Y. 253, 258; *People* v. *Razezicz,* 206 N. Y. 249, 269, 270; *People* v. *Galbo,* 218 N. Y. 283, 293, 294; *People* v. *Lewis,* 275 N. Y. 33, 39; *People* v. *Suffern,* 267 N. Y. 115, 127; *People* v. *Weiss,* 290 N. Y. 160, 163; *People* v. *May,* 290 N. Y. 369, 373.) We apply that test to the record at hand.

There is no evidence that the decedent had more than a slight acquaintance with the defendant which was gained from the following circumstances. At the time of her death the decedent was nineteen years of age and lived with her family at Mariners Harbor, Staten Island, N. Y. For a period of months, in company with a young woman — a neighbor who was called by the People as a witness at the trial — the decedent had crossed by ferry from Staten Island to Elizabeth, New Jersey, where they were both employed. Ordinarily they reached the ferry by a bus route which passed near their homes. However, there were occasions when, while standing at a bus-stop awaiting transportation, they accepted invitations to ride with automobile drivers who were crossing by ferry to New Jersey. Within the month preceding the decedent's death the young women rode at least eight times with a neighbor with whom they had a prior acquaintance. They also rode approximately fifteen times with the defendant with whom they had no prior acquaintance. On each occasion when they were in the defendant's car en route to the ferry and during the crossing to New Jersey they occupied the rear seat until the ferry reached its New Jersey terminus where they left the defendant's car and he proceeded on his way alone. The evidence is undisputed that during those rides the defendant was " respectful " and made no remark which could be considered as " improper." The last occasion when it is known that the decedent rode in the defendant's car was on the morning of December 24, 1942.

There is no direct proof that the defendant ever saw Mary Rycoitch after the morning ride of that date. The record is silent as to what occurred in her life during the days which followed until the evening of December 27th which she spent in the company of friends and returned to her home about two o'clock in the morning of Monday, December 28th. Four hours later — shortly before six o'clock in the morning of the day when the People claim she met her death — the decedent was awakened by her father who gave her breakfast and prepared two sandwiches for her lunch. She left her home as usual at about 6:15 A. M. but promptly returned to ask for a newspaper to serve as protection against the rain. Responsive to this request her father gave her a copy of the Staten Island Advance which he took " out of the pile " without noticing

its date. She then bade him good-bye and left the house — that being the last time her father saw her alive.

There is no direct evidence of what befell the decedent after she left her home at that early hour. As a result of an autopsy the coroner's physician was unable to fix the time of her death more definitely than at some hour between 5 A. M. and noon of December 28th. The place where her death occurred was not the subject of direct evidence. When her body was discovered on the morning of Tuesday, December 29th, there were found between wheel ruts in the lane twenty feet away, a pocketbook, a purse and a small compact. The two sandwiches which her father had prepared for her on the previous Monday morning were on the ground near her body, a single bite having been taken from one sandwich. Although her clothes were disarranged to an extent the autopsy disclosed that she was a virgin, and revealed no evidence that she had been the subject of assault incidental to a sex crime. The coroner's physician was permitted to give it as his opinion that the skull fracture had been caused by a dull instrument which '' might '' have been a hammer and that the two neck wounds, which he described as insufficient to cause death, '' could '' have been caused by a pair of scissors.

Such, in brief outline, is the evidence which relates to the decedent's death — a death which the People charge was homicidal, committed deliberately and with premeditation by the defendant.

The theory of the prosecution was that on the morning of the day when the decedent was killed she had entered the defendant's car, as she had done on prior occasions, expecting to be taken directly to the ferry and thence to Elizabeth, N. J.; that instead of following the usual route to the ferry the defendant drove to the lane leading southerly from Bloomfield Avenue; that improper advances were there made to the decedent which she resisted and in doing so escaped from the car; that she was overtaken by the defendant who, after stabbing her with a scissors and striking her with a hammer, dragged her body to the point in an adjoining field where it was found the following morning. Such, I repeat, was the *theory* of the People's case — but concededly there was a total lack

of direct proof of any one of the several incidents mentioned above. There was no direct evidence that the decedent was in the defendant's car on the day of her death; indeed there was no direct evidence that she had seen the defendant on that day. Accordingly our problem is to search the record for circumstantial evidence which is sufficient in law to sustain the judgment of conviction. If, as a jury has found, the defendant's guilt was established beyond a reasonable doubt, and in the conceded absence of direct proof to sustain the charge, there must be proof of facts from which a clear inference may be drawn pointing to defendant's guilt. That inference may not be based upon conjecture or speculation but must follow logically from proven facts; it must be not only consistent with and point to defendant's guilt but must be inconsistent with his innocence. (*People* v. *Weiss, supra,* p. 163.)

With direction thus given to our inquiry we examine first the evidence descriptive of the defendant himself and then the proof of his movements on the day when the People claim the decedent's death occurred and during a short period prior to that event. The defendant, a man thirty-nine years of age, resided at Stapleton, Staten Island, N. Y. He had a grammar school education, was temperate and had never before been convicted of a crime. For several years prior to December 28, 1942, he had been employed as a drill press operator in a plant at Somerville, N. J. In July, 1942, his wife had left his home after which time the defendant maintained a home for his three children, one of whom was confined in a local hospital at the time with which we are concerned. In a statement made to a detective after his arrest — in which he denied any connection with the death of Mary Rycoitch — the defendant said that the last time he saw her was on Thursday, December 24th, which date was concededly the last day he gave transportation to the decedent and her companion from Staten Island to Elizabeth. It also appears from the defendant's statement to the police that while he was at work on Saturday, December 26th, he became ill; that when he reported that fact to his foreman he was permitted to go to his home. That statement is corroborated by the foreman. The defendant stated further that he remained at home until Sunday afternoon

when he went to the hospital to visit his child; that on the morning of the following day — Monday, December 28th, the day when the prosecution claims the decedent was killed — he planned to return to his regular work and had set his alarm for 5:30 A. M.; that when the alarm failed to sound he scolded his children " for fooling with the clock and causing him not to go to work." When the defendant's thirteen-year-old daughter was called as a witness for the People she denied that her father had scolded her about the clock. It was her testimony on direct examination that while she and her brother were eating their breakfast at ten o'clock the defendant came into the house wearing a maroon jacket, a sweater and a pair of corduroy trousers. On direct examination she stated that she then saw that " He wiped something off his jacket." On cross-examination however she stated that she had not seen him wipe something from his jacket — her statement on direct examination having been " something someone had told [her]."

From testimony given by witnesses called by the People it appears that on this same morning of Monday, December 28th, between ten and eleven o'clock, the defendant went to a garage operated by the People's witness Schweitzer. He told the proprietor that he " had a touch of the grippe " and asked whether repairs to the clutch of his automobile could then be made. The proprietor was unable at that hour to do the work but in the afternoon of that day the defendant's car was brought into the garage and repairs were started. The defendant remained at the garage in the afternoon during which time the mechanic, in the course of his repair work, had occasion to remove the front seat of the defendant's car and in doing so observed that in the tool compartment were a hammer and a pair of scissors. Subsequently, when questioned by the police, the defendant admitted that those were tools which belonged to him and which he always carried in the car, the scissors being used to cut tire patches.

When the defendant was taken into custody on December 31st, two days after the discovery of the decedent's body, there were found in his automobile the same hammer and scissors which had been there while repairs were in progress during the afternoon of December 28th. There were also found a copy

of the Staten Island Advance, a number of contraceptives and a catheter. The fact that a hammer and a scissors were in the defendant's car on the afternoon of December 28th is cited by the People in connection with the testimony by the coroner's physician that the skull fracture suffered by the decedent "might" have been caused by a hammer and that the two lacerations on the neck "could" have been caused by a scissors.

Opposed to the inference of the defendant's guilt, which the People draw from the finding of a hammer and scissors in his car, we are referred to evidence from which the defendant's innocence may be as reasonably inferred. That the hammer and scissors were never put to the felonious use claimed by the People is said to be shown by the undisputed fact, mentioned above, that within a few hours after the time when it is claimed the decedent met her death, the defendant was present in a garage where he had taken his automobile for repairs; that while there, in the process of work which required the removal of the front seat cushion, the hammer and scissors were observed by the mechanic in their accustomed place. From this circumstance, it is said, the inference is reasonable that nothing had occurred that day or at any time which prompted the defendant to put his automobile hammer and scissors out of range of discovery. In addition there is the more important evidence that, although each of the three wounds suffered by the decedent had produced profuse hemorrhage, the mechanic noticed no blood on the hammer and scissors; also that appropriate chemical tests made thereafter by the People's expert revealed no indication of blood on either hammer or scissors.

Upon the assumption that the copy of the Staten Island Advance found in the defendant's car was the same copy of that local newspaper which the decedent's father had taken "from the pile" and had given to her when she left home in the early morning of December 28th, the People draw the inference that the decedent had been in the defendant's car on the morning of December 28th after she left her father. But doubt is cast upon such an inference by the conceded fact that the copy of the newspaper found in the defendant's car bore the date of

December 23, 1941, — more than a year prior to the decedent's death — and contained the following advertisement published over the defendant's name and concerning a matter which naturally would prompt him to retain the publication:

"*Personal.* I will no longer be responsible for any bills contracted by my wife, Susan Tatavano Taddio, 62 Thompkins Street, Stapleton.

Dominick Taddio."

From the fact that in a compartment of the defendant's car were found contraceptives and a catheter the prosecution, by the use of multiple inferences, also contends that the defendant was possessed of a lecherous desire to which the decedent, on the morning of her death, became a victim. But the record reveals no factual bases for such inferences and there is no direct proof that the decedent was thus victimized.

Although the mechanic who worked on the defendant's car during the afternoon of December 28th had occasion to remove the front seat cushion and to take up the floor mat, he saw no blood stains. However, the People produced a pharmaceutical chemist who was an expert in the application of the benzidine test by which the presence of blood may be detected. By direction of the police he applied that test to the right side of the front seat cushion and the inside lining of the right front door of the defendant's automobile; also to various articles of clothing worn by the defendant on December 28th and to scrapings taken from under the defendant's fingernails. These tests afforded the witness information upon which the following testimony was adduced: " Q. In each instance [referring to the several tests made by him] all that you can tell us at this time was that there was a *possible* presence of blood in those areas? A. That is right." (Italics supplied.)

The People also called a serologist who, from tests made, found indications of the presence of blood on various articles of the defendant's clothing, some of which were worn by him on December 28th. This witness tested the blood grouping of the defendant and the decedent from which he determined that the blood of the defendant was of group " A " and that of the decedent was of group " B ". He found human blood of group " B " on the cushion of the front seat of defendant's auto-

mobile and a spot of human blood on the floor mat — "A very tiny spot * * * about a pin head in size" — but he was unable to say that the human blood he had detected in any of the tests was that of the decedent.

There was also expert testimony that a single strand of human hair, which was found attached to the upper surface of the right running board of defendant's automobile, was of texture, length and type of pigmentation similar to the hair of the decedent. But the expert whose testimony related to this subject gave it as his opinion that no reliance can be placed upon conclusions drawn from the appearance presented by a single hair as to the identity of the individual to whom it belonged. Indeed, if it be assumed that the single strand was the decedent's hair — of which there is no direct evidence — there was no proof that it had not become lodged on the running board on December 24th, when the decedent and her neighbor last rode together in the defendant's car to their New Jersey destination.

A detective examined and measured the impression of tire marks made by some automobile on an undisclosed date on or prior to December 29th in the unpaved lane near which the decedent's body was found. After photographing these impressions and examining the front tires of the defendant's automobile the detective testified that — "Those front tires [on defendant's car] could have produced those markings." He admitted, however, that the "impressions in this case * * * were not sufficiently good to determine unique characteristics of any particular tire," and that other tires of similar make and design could have left the imprint found.

To establish defendant's guilt beyond a reasonable doubt it was of first importance to prove the hour of the decedent's death. The only evidence upon this subject came from the coroner's physician who on direct examination fixed the time of decedent's death "somewhere about seven or eight o'clock" of the morning of December 28th. On cross-examination, however, after reviewing the factors which had led him to fix that early hour as the time of death, he gave the following testimony: "Q. So that, basing your finding on the lividity and the absence of rigor in the shoulders and upper portions of the body and the presence of rigor in the knees and the ankles,

wouldn't it be fairer to say that death occurred at *some time between seven and twelve o'clock* on the preceding day? A. *Possibly.*" (Italics supplied.) In determining the question of defendant's guilt the testimony last quoted must be considered with the undisputed evidence that between the hours of 10:00 and 11:00 A. M. of December 28th the defendant was at his home in Stapleton, Staten Island, and had visited a garage and a tailor shop at locations about seven miles from the place where the decedent's body was found.

In this case where the prosecution, of necessity, resorted to circumstantial evidence to establish the defendant's guilt, there was imposed upon the People an unusual burden which required not only the elimination of " reasonable doubt whether his guilt is satisfactorily shown " (Code Crim. Pro. § 389) but also the elimination of uncertainty as to those asserted facts from which inferences of defendant's guilt were drawn. Close scrutiny of this record reveals however that in vital phases of the proof uncertainty abounds where certainty is required. The instances to which we have referred, and others not mentioned, leave us unconvinced that the evidence upon which the judgment of conviction rests satisfies the test for circumstantial evidence. (*People* v. *Woltering,* 275 N. Y. 51, 61, and cases cited *supra.*) Here, as in *People* v. *Galbo* (*supra*) p. 294, " * * * conjecture has filled the gaps left open by the evidence, and the presumption of innocence has yielded to a presumption of guilt."

The judgment of conviction should be reversed and a new trial ordered.

LEHMAN, Ch. J., LOUGHRAN, RIPPEY, CONWAY, DESMOND and THACHER, JJ., concur.

Judgment of conviction reversed, etc.