THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* MOSES TUNSTALL, Appellant.

Fourth Department, March 19, 1958.

*John M. Wilson* for appellant.

*Roger E. Davis, District Attorney,* for respondent.

WILLIAMS, J.    In this first degree murder case, the jury reported a verdict of guilty with a recommendation of life imprisonment, and the defendant was sentenced for life.

The defendant claims, among other things, that the evidence was insufficient to sustain the conviction.    We shall consider this first.

The evidence was wholly circumstantial and must therefore be analyzed and considered under the long-established rule set forth in *People* v. *Taddio* (292 N. Y. 488, 489): " Concededly the defendant's conviction rests upon circumstantial evidence — a process of decision by which a court or jury may reason from circumstances which are known or proved, to establish by inference the reality of the principal fact.   If in a criminal case circumstantial evidence is to be given legal effect the facts from which the inference of guilt is drawn must themselves be proved, not assumed; the controlling inference must be clear and strong, pointing logically to defendant's guilt and excluding to a moral certainty every other reasonable hypothesis. (*The People* v. *Kennedy,* 32 N. Y. 141, 145, 146; *People* v. *Harris,* 136 N. Y. 423, 429; *People* v. *Fitzgerald,* 156 N. Y. 253, 258; *People* v. *Razezicz,* 206 N. Y. 249, 269, 270; *People* v. *Galbo,* 218 N. Y. 283, 293, 294; *People* v. *Lewis,* 275 N. Y. 33, 39; *People* v. *Suffern,* 267 N. Y. 115, 127; *People* v. *Weiss,* 290 N. Y. 160, 163; *People* v. *May,* 290 N. Y. 369, 373.) "

This same rule was restated in slightly different language in *People* v. *Leyra* (1 N Y 2d 199, 206): "As this resumé demonstrates, the evidence relied upon to spell out guilt is entirely circumstantial. According to the well-settled principles applicable to such evidence, its sufficiency depends upon ' whether the proof points logically to defendant's guilt and excludes to a moral certainty, every other reasonable hypothesis '.    (*People* v. *Harris,* 306 N. Y. 345, 351; see, also, e.g., *People* v. *May,* 290 N. Y. 369, 375; *People* v. *Lewis,* 275 N. Y. 33, 39.)    Moreover, ' the facts from which the inferences are to be drawn must be established by direct proof: the inferences may not be based upon conjecture, supposition, suggestion, speculation or upon other inferences '.    (*People* v. *Weiss,* 290 N. Y. 160, 163; see, also, e.g., *People* v. *Taddio,* 292 N. Y. 488, 489; *People* v. *Woltering,* 275 N. Y. 51, 59; *People* v. *Razezicz,* 206 N. Y. 249, 269–270.) "

The body of the victim, a 75-year-old man named Williams, was found at about noon on December 5, 1956 on the floor of his country home in the town of Walworth, Wayne County, New York. It contained 14 knife wounds and slashes. There was evidence of a struggle. It is conceded that the deceased was a homicide victim. Defendant was a Negro farm worker who had decided to start south that day and was in the process of traveling toward Rochester, New York at the time he was arrested.

The only testimony that tends in any way to place the defendant in the vicinity of the crime at the time of its occurrence was that of a neighbor who lived next to the Williams house about one eighth of a mile away. He testified that on the day in question at about 11:35 to 11:40 A.M. he saw a car pass his house with a lone occupant, a colored man, driving toward the deceased's house at about 25 miles an hour. He said he saw this car from a distance of about 60 to 70 feet for a space of about 40 feet or for approximately one second. He identified an uncolored photograph of the defendant's car as a photograph of the car that passed his house. He did not know the driver nor did he ever identify him as the defendant. He was not sure of the color of the car. He thought it was a light gray or light green; actually it was green. He said that the only reason he noticed the car at all was because a man who had lived with him drove a car of the same color and the driver " sat * * * very erect " and the fenders were jammed and rusty. At one time he said that there was " plenty " of traffic on that road and that he had no particular reason to notice it; " It was just another car." He said his *only* means of identification were the marks on the fender. The photograph showed a car with a damaged and rusted right rear fender, but in the rural community in which this event occurred there were probably many cars similarly damaged and rusted and of the same general appearance. Nevertheless, he positively identified the photograph. The witness had known the decedent for about 25 years and they had been good friends. This testimony was a very important link in the chain of evidence necessary to convict this defendant. It is significant that the State police officer who made the arrest and had the car under observation and control for 15 or 20 minutes, could not tell whether the same photograph was one of the defendant's car.

The identification only by the marks on the fender of a car in which the witness had no special interest, on a heavily travelled road and which was under his observation for a period of about one second at a distance of 60 or 70 feet is highly

dubious and not at all impressive or persuasive. In our opinion it has very little probative force and the very positive identification was undoubtedly influenced by the friendship of the witness and the deceased and motivated to some extent at least by a desire to be helpful in the establishment of guilt.

When the defendant was arrested he was carrying a straight knife with a blade about four inches long and about three quarters of an inch wide at the top and tapering to a sharp point at the end. One witness described it as a "regular kitchen knife," but obviously it had been sharpened. There is no doubt that the wounds could have been inflicted by this knife. However, there was nothing unique about the knife so that the mere fact that it could have inflicted the wounds was not of special importance. It was important however that the People produce testimony that human blood had been scraped from the blade of the knife after the arrest. The evidence of the State is this respect was neither satisfactory nor convincing. A member of the State police department who had some chemical training was produced and testified that the knife was stained by human blood. On cross-examination he was vacillating, uncertain and showed a lack of fundamental knowledge of chemistry in general and of the conducted tests in particular. He was not sure that one of the determinative reactions on one of the tests would permit a differentiation between certain other excretions of a body than it would to blood. As to the test to determine whether the blood was human, he at first indicated that he knew the composition and technique of manufacturing the anti-human serum utilized in the test but then admitted that although he was present he did not know how to produce it and was inexpert in its composition and manufacture. His testimony was extremely weak as to controls used, if any, in determining the validity of the significant reactions. It was only after prolonged argument that he was permitted to voice the opinion that the scrapings from the blade contained human blood, but his opinion was most unsatisfactory and left much to doubt. Even if we assume that his tests were clear and properly conducted and that there *was* human blood on the knife, the establishment of that fact alone is far from sufficient to establish that the blood was that of the deceased. No samples of the blood of the deceased were taken or typed although it was readily available both at the scene of the crime and upon subsequent pathological examination. The result was that there could be no comparison of the grouping of the blood on the knife and the blood of the

deceased. A sweater jacket saturated with blood was taken from the deceased's body but no evidence whatsoever of tests thereon was presented nor was it used for the purposes of control in the tests that were actually made from the blade of the knife and from clothing worn by the defendant at the time of his arrest. Blood stains on defendant's clothing, if any, could well have been caused by a previous incident during which the defendant's clothes were stained with his own blood.

It was also claimed by the State police that a heel mark discovered in the back of the Williams house leading toward the driveway fitted one of defendant's shoes. The mark was found about 1:00 P.M. and was distinct as late as 8:00 P.M., at which time the State's expert compared it with defendant's shoe. This expert was also present on at least one other occasion during the afternoon. He stated that he did not have the necessary testing materials with him and that the print was destroyed by the elements the night of the homicide. Neverthless, the fact remains that no cast was made although the mark was clear for at least seven hours.

It is claimed by the prosecution that the defendant was without money and wanted to go south and that he robbed and murdered the deceased to procure the necessary money, but the testimony concerning his financial condition was neither clear nor convincing as to whether he had money or not. The prosecution lays great stress upon the fact that on December 4 he told a friend that he wanted to go south, that he had no money and that he would " stick up " or kill somebody if necessary to get there. It is difficult to believe that he would make a remark of that kind in a serious vein to a person who knew the defendant as " Slim " but did not know his real name.

Problems of distances and time are also important. There were various estimates given as to the time of certain relevant events but two statements stand out as being relatively accurate: One, that the homicide occurred about noon, and the other, that after the arrest, the defendant was taken to the Williams house and arrived there at about 1:45 P.M. A State trooper testified that the defendant was arrested at about 1:30, but that does not seem possible. After the defendant was arrested, his car was at the place of arrest about 15 to 20 minutes. There is no testimony that the defendant remained there that long but he was searched, questioned and arrested at that time. He was then taken to the Webster State police substation and then to the Williams house. There is no testimony as to the distance from the place of arrest to the sub-

station, but it was about 13 miles from the place of arrest to the Williams house, partly over a town road. It would seem that detaining him, searching him, searching the car, arresting him and taking him to the substation and from the substation to the Williams house would occupy at least 45 minutes. Assuming that he arrived at the Williams house at 1:45, the time of arrest must have been about 1:00 P.M. Certainly all of those things could not have been done in 15 minutes, the lapse of time necessary to substantiate the testimony of the trooper that the defendant was arrested at 1:30, so it appears fairly definitely that he was arrested about 1:00 P.M. As we have said, the time of the homicide was about 12:00 noon. If he had been at the scene at the time of the crime, he would then have had to go back to his home 15 to 16 miles away, some of this by a town road, past some traffic signs. He was home for about 30 minutes during which he appeared normal, and unhurried, and then started toward Rochester on his trip south. He travelled 20 to 25 miles to the place of arrest, making a stop on the way at the post office and a liquor store. In other words, in order to have been at the scene of the crime at about noon, he would have had to travel 35 to 40 miles, stop at the post office and the liquor store, spend 30 minutes at home, all in about one hour. So it appears that whichever way the time is computed, it is improbable that the defendant could have been at the Williams house at noon.

The testimony which we have discussed is that which the People relied on most strongly for a conviction. There is of course other testimony for the prosecution in the case, but the conviction cannot stand unless we accept the direct proof that we have mentioned, construe it strongly in favor of the People, and draw unwarranted inferences therefrom in favor of the People. All in all the proof leaves grave doubt as to defendant's guilt, and, in our opinion, the verdict is against the weight of the evidence. Definitely the proof is not " clear and strong " nor is it pointing " logically to defendant's guilt and excluding to a moral certainty every other reasonable hypothesis." (*People* v. *Taddio*, 292 N. Y. 488, 489, *supra*; *People* v. *Leyra*, 1 N Y 2d 199, *supra*.)

The defendant also contends that certain remarks of the District Attorney, both in his opening and in his summation, were sufficiently prejudicial to constitute reversible error. In his opening he stated:

" Mr. Tunstall was immediately returned by Sergeant Murphy, as I told you, to the Williams house. At that time

Mrs. Williams had already gone. She had been transported by ambulance to the home of Hilliger in Ontario.

" Mr. Tunstall was immediately loaded into one of the police cars and transported over to the Hilliger home in Ontario and after leaving the Hilliger home he was taken to the State Police station."

In his summation he said: " There were only three people that knew what transpired in the house of Gus Williams — Mr. and Mrs. Williams are, of course, not here." Mrs. Williams died between the time of the homicide and the time of the trial. There is no testimony in the record to the effect that she ever saw the defendant. Upon the trial and in the quoted portion of his opening, the District Attorney sought to create the inference that Mrs. Williams had identified the defendant before she died, either at the place of the homicide or later at the Hilliger house. There is nothing in the record to substantiate this. During the trial the District Attorney asked a State police officer: "And what did you thereafter do, Corporal?". He answered: " Took the Defendant before Mrs. Williams in Ontario." After a long argument in the absence of the jury, this answer was stricken out without comment by the court. Despite this, the District Attorney made the statement complained of in his summation. Exceptions to these remarks were taken by the defendant, but the court indicated that there was nothing that he or the District Attorney could do and said nothing about them in his charge.

In *People* v. *Tassiello* (300 N. Y. 425, 427) it was said: " ' Language which might be permitted to counsel in summing up a civil action cannot with propriety be used by a public prosecutor, who is a quasi-judicial officer, representing the People of the state, and presumed to act impartially in the interest only of justice.' (*People* v. *Fielding,* 158 N. Y. 542, 547.) That pronouncement by this court is declaratory of the simple principle of fairness which was decisive in the cited case and pervades those rules which govern the administration of criminal law. In the case we now review that principle again becomes decisive."

This court has recently condemned overzealous advocacy by the prosecuting attorney (*People* v. *Nicoll,* 3 A D 2d 64). And in *People* v. *Lovello* (1 N Y 2d 436, 439), the Court of Appeals condemned " practices by any prosecutor in making himself an unsworn witness and supporting his case by his own veracity and position (see *Berger* v. *United States,* 295 U. S. 78, 88;

*People* v. *Tassiello,* 300 N. Y. 425, 430; *People* v. *Swanson,* 278 App. Div. 846, 847)."

We find that such statements were erroneous and seriously prejudicial.

There is one other matter which requires comment. The Judge charged the jury fully, adequately and clearly as to the legal principles involved in a determination of a case such as this. However, he failed almost entirely to comment on the evidence and the contentions of the parties. Surely there was no marshalling of the evidence and contentions sufficient to meet the principles that this court has previously laid down.

The necessity for and the importance of a proper recapitulation of the evidence to refresh the memories of the jurors and to help them pass upon the issues intelligently was stressed by this court in *People* v. *Kenda* (3 A D 2d 80, 87) as follows: " Closely allied to this was the failure of the trial court to summarize or marshal the evidence for the benefit of the jury. It has been written that ' In a criminal case we think the judge has the right, and indeed it is his duty to present the evidence to the jury in such light and with such comments that the jury may see its relevancy and pertinency to the particular issue upon which it was admitted, and thus be better qualified to appreciate its character and weight and to determine its credibility.' (*People* v. *Fanning,* 131 N. Y. 659, 663.) And in *People* v. *Odell* (230 N. Y. 481, 488) it was said that ' The trial judge should not as a rule limit himself to stating good set terms of law culled from the codes and the reports. Jurors need not legal definitions merely. They require proper instructions as to the method of applying such definitions after reaching their conclusions on the facts.' This court has recently had occasion to reiterate this rule citing the foregoing and other authorities. (*People* v. *Birch,* 283 App. Div. 844.) "

This clearly is in keeping with the established rules set forth in Bishop's New Criminal Procedure (2d ed., Vol. 2, § 978, p. 814): " The Whole Case,— consisting of law, fact, presumptions of law and of fact, pleading, evidence, and the respective duties of court and jury therein, must be separated from all that is extraneous and superfluous, and laid divested thereof before the jury."

Upon the insufficiency of.the evidence, the prejudicial remarks of the District Attorney in his opening and summation and the failure of the Trial Justice to analyze and marshal the evidence and the respective contentions of the parties, this case should be reversed, the judgment of conviction set aside and a new trial granted to the defendant.

All concur, except BASTOW, J., who dissents and votes for affirmance. Present: McCURN, P. J., WILLIAMS, BASTOW, GOLDMAN and HALPERN, JJ.

Judgment of conviction reversed on the law and facts and a new trial granted.