Joseph A. Martinis, J.
Defendant has moved for an inspection of the Grand Jury minutes or, alternatively, a dismissal of the indictment charging her with murder, first degree,, in that on the 27th day of October, 1959, she did with malice aforethought willfully kill one Raymond Garrett, a male child of the age of 30 months by placing and covering a plastic bag over his face and head, causing him to be asphyxiated by the said bag, from which he died.
The District Attorney has submitted an answering affidavit to the instant application consenting only to the court’s inspection of the Grand Jury minutes. Neither of the issues as raised in the moving papers and on the oral argument had herein are answered by such affidavit.
It appears that the deceased child was the son of the defendant, having been born prior to her marriage to her present husband. The record is not clear whether the infant was born out of wedlock or was the issue of a prior marriage by the defendant. In any event, the defendant had custody of the child at the time of the incident in question.
The moving papers allege that this defendant and her husband John Harris have had many marital difficulties during their marriage, separating and being reconciled on several occasions. On one occasion, after the defendant had allegedly been struck and beaten by her husband, she brought a charge of assault against him in Westchester County, where she was living and working as a domestic.
While that charge was pending against him, the defendant’s husband, John Harris, went to a Bronx police station and there presented to a detective three letters purportedly signed by his wife, one addressed to him, stating that she had killed her child (Raymond Garrett) and was sorry; another, addressed to her mother, stating that she had sexual relations with her stepfather, and the third, addressed to “ Whom It May Concern ”, admitting sexual activities with certain named females, With regard to these letters, the defendant, through her counsel, urges that while she was living with John Harris he forced her to write these letters at gunpoint, during one of their quarrels, and that he had kept them without disclosing their contents to anyone until their last separation, which culminated in the assault charges she placed against him. Defendant contends in her moving papers that the letters, and specifically the one in which *195 she admitted killing her child, were inadmissible against her since they were not voluntary admissions. If this contention posed the sole issue for determination under the instant application, the admissibility of the incriminating letter as a voluntary admission or confession of guilt by the defendant would be a factual one for resolution by the trial jury, and would not affect the legal sufficiency of the indictment.
However, upon the argument of the motion in open court, this approach was abandoned, and the defendant, through counsel, there contended that this latter letter implicating herself in the asphyxiation of the deceased was a privileged communication between husband and wife, and was inadmissible as evidence against her, as provided by section 2445 of the Penal Law; that the exclusion of such letter from evidence vitiated the indictment against her, since there was no other proof connecting her with the commission of the charged crime, and especially since she had previously been exonerated when the death of the child was investigated by the District Attorney on October 27, 1959, and a finding was made by the Medical Examiner that the infant’s death was an accident, and did not result from a criminal agency.
It appears from the Grand Jury minutes herein that when first questioned by the police at the time of the incident in question, the defendant stated that while she was in the kitchen of her home performing household chores, she noticed that her child, which she had placed on the couch in another room, was very quiet; and that when she went into the room where the couch was she saw her child inside garment plastic bags that were all entangled. When interrogated as to how the child got into the bag she speculated that he had crawled in, and that while inside he would have control of the zipper. This interrogation, it is noted, occurred after she had called the police for help, and after an unsuccessful effort by the police to revive the child by artificial respiration when he was found still warm.
The defendant’s husband, John Harris, testified before the Grand Jury that the defendant had a child, the deceased, when he married her; that after the death of the child his wife was going back and forth to her mother, and that at one point she stayed away from home for about two weeks and then returned, and that they never lived happily after that; that on one occasion while she was away from home she had left a note in the house for him which read as follows: “ Johnny: There is something I would only admit to you and no one else, but the death of my baby was no accident. I fooled you and I fooled the police, and I am sorry that it ever happened. But when I put the bag over *196 the baby’s head I couldn’t stop. And I didn’t want to stop. I don’t know why I did this. All three of us were getting along so fine. But our baby Lorraine (the issue of the defendant’s marriage to Harris) I do love and I’ll never do anything to hurt her. Love. Betty.”
When Harris was asked by the District Attorney, while being examined before the Grand Jury, what, if anything, he did with this note after he found it, the following colloquy occurred:
“A. I didn’t do anything. I waited for my wife. I knew she would be calling because her and her mother didn’t get along. When she came back I spoke to her about this.
“ Q. Was that note ever exhibited? A. I thought I had lost it but I found it. I showed it to my landlady and landlord.
“ Q. Did your wife ever show it to anybody? A. I don’t think so.
“ Q. Did there come a time when eventually you brought this note to the 48th Squad of detectives? A. Yes. I took it over to Detective Duffy over in the precinct * * *.
“ Q. Between the time you found the note and the time you brought it to Detective Duffy had you and your wife, in fact, been involved in some sort of personal litigation in Westchester County? A. It was after.
“ Q. * * * She took you to court before you found this note? A. Yes.”
The foregoing is the substance of the pertinent testimony of John Harris insofar as it affects the status between the defendant and this witness at the time she wrote the note implicating herself in the homicidal death of the deceased male child, Raymond Garrett.
Section 2445 of the Penal Law reads as follows: “ Husband or wife as witness. The husband or wife of a person indicted or accused of a crime is in all cases a competent witness, on the examination or trial of such person; but neither husband nor wife can be compelled to disclose a confidential communication, made by one to the other during their marriage.” This rule of law was derived from section 715 of the Penal Code (L. 1881, ch. 676).
At common law, the wife of a prisoner was not a competent witness in a criminal action or proceeding against him. In 1867 (L. 1867, ch. 887, § 2) a wife was made a competent witness for or against her husband in civil actions and proceedings only. (Wilke v. People, 53 N. Y. 525.) In 1876 (L. 1876, ch. 182, § 2) a husband or wife was permitted to be examined as a witness on behalf of the other in all criminal trials. (People v. Hovey, 29 Hun 382, affd. 92 N. Y. 554.) Under that statute, she was *197 not permitted to testify against her husband even though she were willing to do so (People v. Houghton, 24 Hun 501; People v. Briggs, 60 How. Prac. 17).
The rule affecting husband and wife at common law had it? foundation ‘ ‘ in the identity of their rights and concerns, the interest of civil society, and the sanctities of the marriage relation ” and it was enforced by the courts with much strictness (People v. Houghton, supra, p. 501). The object was “ that the most entire confidence may exist between them, and that there may be no apprehension that such confidence can, at any time, or in any event, be violated,- so far, at least, as regards any testimony or disclosure in a court of justice ” (Chamberlain v. People, 23 N. Y. 85, 89). While these statutory modifications were in derogation of the common law and should be strictly construed, they should not be permitted to accomplish anything beyond what was fairly intended. Competency of husband and wife as witnesses has been effected and enlarged but the essential nature, meaning and implications of the clause “ a confidential communication, made by one to the other during their marriage ” has not been altered (People v. Daghita, 299 N. Y. 194, 198).
In defining ‘1 confidential communication ’ ’ within the meaning of the section, the court said in Parkhurst v. Berdell (110 N. Y. 386, 393): “ They are such communications as are expressly made confidential, or such as are of a confidential nature or induced by the marital relation”. Moreover letters between husband and wife are as much within the protection of the rule as are oral comnranications (Hopkins v. Grimshaw, 165 U. S. 342).
Clearly, the nature of the contents of the note, in the instant case, was not only confidential, but it was apparently induced by the marital relation, for it cannot be conceived that such a revelation would have been made but for the existence of such relation between the parties. Its nature, and the relation of the parties, forbade the thought of its being told to others, and the law stamps it with a seal of confidence.
It is manifest from the language employed by the defendant in the note that it was induced by the marital relation and prompted by the affection, confidence and loyalty engendered by such relation (Poppe v. Poppe, 3 N Y 2d 312; People v. Daghita, 299 N. Y. 194, supra; People v. Wood, 126 N. Y. 249; Parkhurst v. Berdell, 110 N. Y. 386, supra).
Disturbing as it is to this court, the conclusion is inescapable that the note in question is a confidential communication, within the privileged intendment of the law, induced by the marital *198 relationship herein and therefore barred as evidence against the defendant (People v. Oyola, 6 N Y 2d 259, 265).
The fact that the defendant and her husband may have lived separate and apart at different intervals or that there was occasional bickering between them, cannot serve in the present posture of this case to dissuade the court from concluding that the marital status, nonetheless, existed within the statutory regulations of privileged communications (People v. Oyola, supra). In the Oyola case the court concluded that the communication made, by the defendant to his wife was privileged despite the fact that at the time it was made the parties were separated and living apart.
Barring this note as evidence against the accused, there is insufficient circumstantial evidence present to warrant her conviction. Conviction on circumstantial evidence cannot be sustained unless the proof points logically to the defendant’s guilt and excludes to a moral certainty every other reasonable hypothesis, i.e., the proven facts must be consistent with and point to the defendant’s guilt and are inconsistent with her innocence (People v. Weiss, 290 N. Y. 160; People v. Taddio, 292 N. Y. 488; People v. Woltering, 275 N. Y. 51). A mere scintilla of evidence or even some proof to sustain the charge is not enough to create an issue of fact to submit before a jury (People v. Ledwon, 153 N. Y. 10).
The court therefore finds that the legal evidence adduced before the Grand Jury is such as would not, if unexplained or uncontradicted, warrant a conviction by the trial jury (Code Grim. Pro., § 251) and the indictment is accordingly dismissed.